UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PHILADELPHIA INDEM. INS. CO., a/k/a Highland
Park Golf Course, Inc.,

        Plaintiff,

v.                                                                                    5:09-CV-1104
                                                                                      (GTS/DEP)
JEROME FIRE EQUIP. CO.; ABJ FIRE PROT. CO.;
D'ALBERTO REFRIGERATION SERV., INC.;
and SANFORD & BURTIS FIRE EQUIP., INC.,

        Defendants.
_____

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

        Currently before the Court, in this insurance subrogation action filed by Philadelphia

Indemnity Insurance Company ("Plaintiff") against D'Alberto Refrigeration Service, Inc.

("Defendant D'Alberto"), Jerome Fire Equipment Company ("Defendant Jerome"), ABJ Fire

Protection Company ("Defendant ABJ Fire"), and Sanford & Burtis Fire Equipment, Inc.

("Defendant Sanford & Burtis"), are the following four motions: (1) a motion for summary

judgment filed by Defendant D'Alberto (Dkt. No. 65); (2) a motion for summary judgment filed

by Defendant Jerome (Dkt. No. 66); (3) a motion for summary judgment filed by Defendant ABJ

Fire (Dkt. No. 67); and (4) a motion for summary judgment filed by Defendant Sanford & Burtis

(Dkt. No. 68.)  For the reasons set forth below, those four motions are granted in part and denied

in part.

# TABLE OF CONTENTS

I.      RELEVANT BACKGROUND.................................................................................3

        A.      Plaintiff's Complaint.................................................................................3

        B.      Parties' Briefing on Defendants' Motions for Summary Judgment.....................4
                1.      Briefing on Motion Filed by Defendant D'Alberto....................................4
                2.      Briefing on Motion Filed by Defendant Jerome.........................................7
                3.      Briefing on Motion Filed by Defendant ABJ Fire.......................................9
                4.      Briefing on Motion Filed by Defendant Sanford & Burtis.......................11

        C.      Statements of Undisputed Material Facts..................................................14
                1.      Undisputed Material Facts on D'Alberto's Motion...................................14
                2.      Undisputed Material Facts on Defendant Jerome's Motion....................24
                3.      Undisputed Material Facts on Defendant ABJ Fire's Motion...............44
                4.      Undisputed Material Facts on Defendant Sanford & Burtis'
                        Motion...........................................................................................53

II.     RELEVANT LEGAL STANDARDS..............................................................69

        A.      Standard Governing Motion for Summary Judgment..........................69
        B.      Standard Governing Unopposed Motions..........................................69
        C.      Standards Governing Claims for Negligence, Breach of Contract and
                Breach of Express or Implied Warranties..........................................71

III.    ANALYSIS..................................................................................................72

        A.      Defendant D'Alberto's Motion for Summary Judgment......................72
        B.      Defendant Jerome's Motion for Summary Judgment..........................73
        C.      Defendant ABJ Fire's Motion for Summary Judgment.......................75
        D.      Defendant Sanford & Burtis' Motion for Summary Judgment............77

# I.    RELEVANT BACKGROUND

## A.    Plaintiff's Complaint

Generally, Plaintiff's Complaint asserts the following twelve claims, arising from a fire

that occurred on September 4, 2007, in the kitchen of the clubhouse of Highland Park Golf

Course, which destroyed that clubhouse: (1) a claim of negligence against Defendant Jerome; (2)

a claim of breach of contract against Defendant Jerome; (3) a claim of breach of express or

implied warranties against Defendant Jerome; (4) a claim of negligence against Defendant ABJ

Fire; (5) a claim of breach of contract against Defendant ABJ Fire; (6) a claim of breach of

express or implied warranties against Defendant ABJ Fire; (7) a claim of negligence against

Defendant D'Alberto; (8) a claim of breach of contract against Defendant D'Alberto; (9) a claim

of breach of express or implied warranties against Defendant D'Alberto; (10) a claim of

negligence against Defendant Sanford & Burtis; (11) a claim of breach of contract against

Defendant Sanford & Burtis; (12) a claim of breach of express or implied warranties against

Defendant Sanford & Burtis.  (Dkt. No. 1.)  Generally, in each of their Answers, Defendants

asserted cross-claims against one another.  (*See* Dkt. Nos. 10, 14, 15, 18.)[1]

Because the parties have, in their memoranda of law, demonstrated an accurate

understanding of the factual allegations giving rise to these claims and cross-claims, the Court

will not summarize those allegations in this Decision and Order, which is intended primarily for

---

[1]    In addition, Plaintiff's Complaint asserted three claims against T&N Cleaning Company: (1) a claim of negligence; (2) a claim of breach of contract; and (3) a claim of breach of express or implied warranties.  (Dkt. No. 1.)  Moreover, T&N Cleaning Company's Answer asserted a cross-claim against Defendant Jerome, Defendant ABJ Fire, Defendant D'Alberto, and Defendant Sanford & Burtis.  (Dkt. No. 6.)  However, on February 20, 2013, Plaintiff's claims against T&N Cleaning Company, as well as T&N Cleaning Company's cross-claim against its co-Defendants, were voluntarily discontinued.  (Dkt. No. 91.)

the review of the parties. Rather, the Court will discuss those allegations only where necessary below in this Decision and Order.

**B.     Parties' Briefing on Defendants' Motions for Summary Judgment**

**1.     Briefing on Motion Filed by Defendant D'Alberto**

Generally, in support of its motion for summary judgment, Defendant D'Alberto asserts the following seven arguments: (1) Plaintiff's witnesses, Gerald Kufta and James Valentine, should be precluded from giving expert witness testimony against D'Alberto pursuant to Fed. R. Evid. 702, because their testimony is not based upon sufficient facts or data, their testimony is not the product of reliable principles and methods, and they have not applied the principles and methods reliably to the facts of the case; (2) Plaintiff's claims against Defendant D'Alberto should be dismissed because, based on the current record (including the affidavit of engineer Mark Dempsey), no rational fact finder could conclude that having only one operational kitchen exhaust fan was a cause of, or contributing factor in, the fire; (3) Plaintiff's negligence claim against Defendant D'Alberto should be dismissed because, based on the current record, no rational fact finder could conclude that there was any detrimental reliance by Highland Park on the alleged statement by Mr. D'Aberto about cooking; (4) Plaintiff's claims against Defendant D'Alberto should be dismissed because, as an independent contractor (that was not under contract to provide routine or systematic maintenance of the fans in question), Defendant D'Alberto had no duty to warn Plaintiff of any purported design defects in the fans in question; (5) Plaintiff's claims against Defendant D'Alberto should be dismissed because, based on the current record, the sole proximate cause of any alleged problems with the inspection and maintenance was the action or inaction of Plaintiff alone, given that Plaintiff had the ultimate

responsibility for inspection, maintenance and cleanliness of the ventilation control and fire protection of the commercial cooking operation, which responsibility Plaintiff never transferred in written form to another party; (6) Plaintiff's breach-of-warranty claim against Defendant D'Alberto should be dismissed because (a) the attempted repair of the exhaust fan was a service to be performed at Plaintiff's facility, not an agreement relating to the sale of goods, and (b) a claim for improper service sounds in negligence, not breach of warranty; and (7) Plaintiff's breach-of-contract claim against Defendant D'Alberto should be dismissed because (a) there was no written contract between Defendant D'Alberto and Plaintiff for the repair of the exhaust fan in question, and (b) nothing in those parties' oral communications gives rise to an oral contract involving terms that Defendant D'Alberto somehow breached, through its attempt to repair the fan, discovery that it could not do so onsite, and advice to Plaintiff to that effect. (Dkt. No. 65, Attach. 12.)

Generally, in response to Defendant D'Alberto's motion, Plaintiff asserts the following six arguments: (1) Plaintiff's witnesses, Mr. Kufta and Mr. Valentine, should not be precluded from giving expert witness testimony against D'Alberto pursuant to Fed. R. Evid. 702, because (a) preclusion should not be requested, or granted, at this time but only upon a pre-trial motion in limine, (b) in any event, both Mr. Kufta and Mr. Valentine have a scientific basis to support their testimony, which is the product of reliable principles and methods, and the reliable application of those principles and methods to the facts of the case; (2) based on the current record, a rational fact finder could conclude that having only one operative kitchen exhaust fan was a cause or contributing factor in the fire; (3) based on the current record, a rational fact finder could conclude that Plaintiff relied to its detriment on David D'Alberto's instructions; (4) based on the

current record, a rational fact finder could conclude that Defendant D'Alberto had a duty to warn Plaintiff of the hazard created by its alteration of the way the air flowed under the hood of the exhaust fan in the kitchen; (5) based on the current record, a rational fact finder could conclude that Plaintiff acted responsibly to maintain the ventilation control and fire protection of its cooking when it hired Defendant D'Alberto, a company that held itself out as qualified to repair the exhaust fan; and (6) based on the current record, a rational fact finder could conclude that Defendant D'Alberto breached its contract with Plaintiff when it improperly repaired the exhaust fan. (Dkt. No. 69, Attach. 3.)

Generally, in reply to Plaintiff's response, Defendant D'Alberto asserts the following three arguments: (1) Plaintiff has not produced any scientific evidence to rebut the opinion of Mark Dempsey that having only one operable exhaust fan was not the cause of, or contributing factor in, the fire; (2) the alleged reliance upon a brief conversation in the kitchen, and one phone call the weekend before the fire, is not reasonable or sufficient for Plaintiff to claim justifiable reliance and a duty to warn; and (3) even assuming that Robert Murphy's and Joseph Nadherny's recollections of their conversations with Mr. D'Alberto were accurate, no material factual dispute would exist, sufficient to avoid the granting of summary judgment in favor of Defendant D'Alberto, because Plaintiff's witnesses still should be precluded, and there is an absence of proof on the issue of causation, the duty to warn, and reasonable reliance. (Dkt. No. 79.)

Generally, in sur-reply to Defendant D'Alberto's reply, Plaintiff asserts the following two arguments: (1) while Plaintiff withdraws its argument regarding negligence per se against Defendant D'Alberto, Plaintiff maintains its claim of negligence against Defendant D'Alberto, based on D'Alberto's alleged violations of industry standards, and its specifically instructing two

6

of Plaintiff's employees that they could continue to use the cooking line even though it was impaired by the removal of a fan; and (2) however, Plaintiff agrees to dismiss its breach-of-warranty claims against all Defendants. (Dkt. No. 87.)

### 2. Briefing on Motion Filed by Defendant Jerome

Generally, in support of its motion for summary judgment, Defendant Jerome asserts the following three arguments: (1) based on the current record, Plaintiff cannot sustain a claim of negligence against Defendant Jerome because (a) Jerome had no duty to inspect anything other than the Ansul Fire Suppression System, which functioned properly at the time of the fire, (b) Jerome had no duty to warn of that which could not be perceived, (c) Jerome had no duty to warn Plaintiff of an open and obvious condition, and (d) Jerome's actions were not the proximate cause of the fire; (2) based on the current record, Plaintiff cannot sustain a claim for breach of contract against Jerome; and (3) based on the current record, Plaintiff cannot sustain a claim of breach of warranty against Jerome. (Dkt. No. 66, Attach. 4.)

Generally, in response to Defendant Jerome's motion, Plaintiff asserts the following four arguments: (1) based on the current record, there is a genuine dispute of material fact on Plaintiff's claim of negligence against Jerome, specifically, whether Jerome fulfilled its duty to Plaintiff to inspect Plaintiff's fire suppression system pursuant to "NFPA 96" and to warn Plaintiff of any non-compliant issues and the hazards associated thereto (so as to allow it to take the necessary precaution and corrections to them and avoid the harm); (2) based on the current record, there is a genuine dispute of material fact on Plaintiff's claim of negligence against Jerome, specifically, whether Jerome's failure to inspect and warn Plaintiff of the non-compliant gaps behind the ventilation hood and the non-compliant features of its fire suppression system

(including but not limited to the non-liquid tight duct welds) constitutes negligence per se; (3) based on the current record, there is a genuine dispute of material fact on Plaintiff's claim of negligence, specifically, whether the acts of others constitute superseding and intervening acts to relieve Jerome of liability; and (4) based on the current record, there is a genuine dispute of material fact on Plaintiff's claims of breach of contract and breach of warranty, because of Plaintiff's status as an intended beneficiary of the agreement between Defendant ABJ Fire and Jerome.  (Dkt. No. 73, Attach. 3.)

Generally, in reply to Plaintiff's response, Defendant Jerome asserts the following five arguments: (1) Jerome has no duty for any failure to warn, because (a) Plaintiff's expert has asserted only that Jerome failed to warn of the welding at the duct collar, and the gap between the hood and the wall, (b) Jerome had no duty to detect an alleged defective weld in a concealed area, (c) Jerome breached no duty to warn with respect to the "gap," and (d) Plaintiff knew the gap existed; (2) Plaintiff's claims against Jerome are based on a flawed reading of the National Fire Protection Association ("NFPA") standard and the Court should reject Plaintiff's arguments as a matter of law; (3) it cannot be said that any actions of Jerome were the proximate cause of the fire; (4) the agreement between Plaintiff and Defendant ABJ Fire cannot sustain a claim against Defendant Jerome for breach of contract; and (5) Jerome cannot be held liable for breach of warranty.  (Dkt. No. 82.)

Generally, in sur-reply to Defendant Jerome's reply, Plaintiff asserts the following two arguments: (1) while Plaintiff withdraws its argument regarding negligence per se against Defendant Jerome, Plaintiff maintains its claim of negligence against Defendant Jerome, based on Jerome's alleged violations of industry standards, and Jerome's failure to properly inspect the

hood system; and (2) however, Plaintiff agrees to dismiss its breach-of-warranty claims against all Defendants.  (Dkt. No. 87.)

### 3.    Briefing on Motion Filed by Defendant ABJ Fire

Generally, in support of its motion for summary judgment, Defendant ABJ Fire asserts the following three arguments: (1) based on the current record, Defendant ABJ Fire is entitled to summary judgment on Plaintiff's claim of negligence against it, because (a) the NFPA standards contain no explicit "duty to warm" Plaintiff of any alleged "gap" between the rear of the exhaust hood and the back wall of the kitchen, (b) in any event, no such warning was required given that Plaintiff was aware of the "gap" based on its periodic cleanings of the back wall of the kitchen, located behind the cook line, and (c) because the "non-liquid tight welds at the duck collar" would not have been visible to Ansul inspectors performing a "visual inspection" in accordance with "NFPA 17A," the existence of that alleged noncompliance cannot form the basis of liability against Defendant ABJ Fire; (2) based on the current record, Defendant ABJ Fire is entitled to summary judgement on Plaintiff's breach-of-contract claim against it, because (a) the test-and-inspection contract did not confer on Defendant ABJ Fire a duty to warn of the alleged "gap" or "non-liquid tight welds," and (b) the breach-of-contract claim against Defendant ABJ Fire cannot be maintained where, as here, the negligence claim against it has been dismissed; and (3) based on the current record, Defendant ABJ Fire is entitled to summary judgement on Plaintiff's breach-of-warranty claim against it, because (a) nowhere has Plaintiff provided the contents or substance of any alleged express and/or implied warranties, and (b) it is settled law that, where an agreement is to provide services only, implied warranty claims cannot stand.  (Dkt. No. 67, Attach. 4.)

Generally, in response to Defendant ABJ Fire's motion, Plaintiff asserts the following three arguments: (1) Defendant ABJ Fire (individually and through its contractor, Defendant Jerome) owed Plaintiff a duty to inspect–from either the floor or any other necessary position–its fire suppression system pursuant to NFPA 96 and to warn Plaintiff of the two non-compliant issues in question (i.e., the gap and non-liquid tight weld) and the hazards associated thereto, in order to allow Plaintiff to take the precautions and corrections necessary to avoid the harm; (2) Defendant ABJ Fire's failure to warn Plaintiff of the non-compliant issues with the fire suppression system, including the non-liquid tight welds and hazardous gap that existed, violated a state statute (i.e., NFPA 96, which was incorporated with the Fire Code of New York State at the time of the fire) and thus constitutes negligence per se; and (3) based on the current record, Defendant ABJ Fire is not entitled to summary judgment as to Plaintiff's breach-of-contract claim and breach-of-warranty claim against it, in part because the contract required an inspection pursuant to NFPA 96, which did not occur. (Dkt. No. 72, Attach. 3.)

Generally, in reply to Plaintiff's response, Defendant ABJ Fire asserts the following four arguments: (1) Plaintiff has failed to come forward with evidentiary proof in admissible form that Defendant ABJ Fire was negligent, because (a) any "duty to warn" of the alleged "gap" was met due to Plaintiff's awareness of that "gap," and (b) the non-liquid tight welds were not visible to Ansul inspectors performing their examinations in accordance with NFPA 17A and thus do not give rise to a duty to warn; (2) under the circumstances, negligence per se has no application to the provisions of the NFPA contained in the Fire Code of New York State; (3) Plaintiff has failed to rebut Defendant ABJ Fire's argument that it is entitled to summary judgment on Plaintiff's breach-of-contract claim for the two reasons described in Defendant ABJ Fire's

memorandum of law in chief; and (4) summary judgment is appropriate with regard to Plaintiff's claim of breach-of-warranty against Defendant ABJ Fire, because, as explained earlier, it is settled law that, where an agreement is to provide services only, implied warranty claims cannot stand. (Dkt. No. 83.)

Generally, in sur-reply to Defendant ABJ Fire's reply, Plaintiff asserts the following two arguments: (1) while Plaintiff withdraws its argument regarding negligence per se against Defendant ABJ Fire, Plaintiff maintains its claim of negligence against Defendant ABJ Fire, based on ABJ Fire's alleged violations of industry standards, and ABJ Fire's failure to properly inspect the hood system; and (2) however, Plaintiff agrees to dismiss its breach-of-warranty claims against all Defendants. (Dkt. No. 87.)

**4.      Briefing on Motion Filed by Defendant Sanford & Burtis**

Generally, in support of its motion for summary judgment, Defendant Sanford & Burtis asserts the following five arguments: (1) because Defendant Sanford & Burtis performed a recharge of the fire suppression system in question on June 28, 2006, any claim of negligence arising from that recharge (which was filed in this Court on September 30, 2009) is barred by the governing three-year statute of limitations, as a matter of law; (2) because Defendant Sanford & Burtis performed its final semi-annual inspection of the Ansul fire suppression system in question in or around February of 2001 (and never performed any such inspection during its recharge in July of 2006, which occurred as a courtesy to Defendant Jerome), any claim of breach of contract or breach of warranty (which were filed in this Court on September 30, 2009) are barred by the governing six-year statute of limitations, as a matter of law; (3) because the evidence conclusively establishes that the actions of others constituted superseding intervening

acts that relieved Sanford & Burtis of any liability as a matter of law, Plaintiff's claim for negligence against Defendant Sanford & Burtis should be dismissed; (4) because Defendant Sanford & Burtis owed no duty to warn of any issues with the hood, duct, or ventilation system (which Sanford & Burtis was never contractually obligated to install, inspect or maintain), Plaintiff's causes of action against Sanford & Burtis should be dismissed; and (5) Plaintiff's own expert has testified that (a) one of the non-compliant issues with the hood (i.e., the non-liquid tight weld) was not visible to an inspector and (b) if Highland Park was aware of the other non-compliant issue (i.e., the alleged gap), then Sanford & Burtis had no duty to warn of it. (Dkt. No. 68, Attach. 4.)

Generally, in response to Defendant Sanford & Burtis's motion, Plaintiff asserts the following five arguments: (1) because Plaintiff's negligence claim began to accrue on the date of injury (i.e., September 4, 2007), not the date on which Defendant Sanford & Burtis completed its work (i.e., July of 2006), that negligence claim is timely under the governing three-year statute of limitations; (2) because admissible record evidence exists from which a rational fact-finder could conclude Defendant Sanford & Burtis performed a contractual inspection of the fire suppression system in question during the "recharge" that occurred on June 28, 2006, any claim of breach of contract arising from that event is timely under the governing six-year statute of limitations; (3) based on the current record, there is a genuine dispute of material fact as to whether the acts of others constituted superseding intervening acts that relieved Sanford & Burtis of any liability as a matter of law on Plaintiff's negligence claim against Sanford & Burtis; (4) Defendant Sanford & Burtis owed Plaintiff a duty to inspect its fire suppression system pursuant to NFPA 96, and to

warn Plaintiff of any non-compliant issues and the hazards associated thereto, to allow it to take the necessary precautions and corrections to the same and avoid the harm; and (5) Defendant Sanford & Burtis' failure to warn Plaintiff of the non-compliant issues of the fire suppression system, including but not limited to the non-liquid tight welds and hazardous gap that existed, constituted a violation of a state statute and thus negligence per se. (Dkt. No. 71, Attach. 3.)

Generally, in reply to Plaintiff's response, Defendant Sanford & Burtis asserts the following four arguments: (1) Plaintiff's claims for breach of contract against Defendant Sanford & Burtis are time barred; (2) Plaintiff has not demonstrated that an issue of fact exists with regard to Defendant Sanford & Burtis' argument that subsequent intervening acts, including acts of Plaintiff's insured, relieved Sanford & Burtis of any liability for Plaintiff's damages; (3) Defendant Sanford & Burtis owed no duty to inspect the ventilation system for the defects alleged by Plaintiff's expert and, even assuming that Sanford & Burtis did conduct an inspection, that inspection was limited to inspecting the Ansul fire suppression system only for defects that would prevent its operation in the event of a fire within the coverage area; and (4) because Defendant Sanford & Burtis did not violate any state statute imposing a specific duty on it, Plaintiff's argument regarding negligence per se is without merit. (Dkt. No. 84.)

Generally, in sur-reply to Defendant Sanford & Burtis's reply, Plaintiff asserts the following two arguments: (1) while Plaintiff withdraws its argument regarding negligence per se against Defendant Sanford & Burtis, Plaintiff maintains its claim of negligence against Defendant Sanford & Burtis, based on Sanford & Burtis' alleged violations of industry standards, and Sanford & Burtis' failure to properly inspect the hood system; and (2) however, Plaintiff agrees to dismiss its breach-of-warranty claims against all Defendants. (Dkt. No. 87.)

C.    **Statements of Undisputed Material Fact**

1.    **Undisputed Material Facts on Defendant D'Alberto's Motion**

The following facts have been asserted and supported by Defendant D'Alberto in its Rule 7.1 Statement and either expressly admitted by Plaintiff or denied by Plaintiff without a supporting record citation in its Rule 7.1 Response.  (*Compare* Dkt. No. 65, Attach. 11 [Def. Alberto's Rule 7.1 Statement] *with* Dkt. No. 69, Attach. 2 [Plf.'s Rule 7.1 Response].)  Docket citations given below are to the screen number shown on the docket, not the page number listed on the document.

1. A fire occurred at the clubhouse of Highland Park Golf Course, Inc. ("Highland Park") on September 4, 2007, causing damage to the clubhouse.

2. For about three years before the fire, D'Alberto Refrigeration ("D'Alberto") had been doing preventative maintenance service for the heating and cooling systems (known in the trade as "HVAC") at the Highland Park golf club facility.

3. On January 13, 2007, D'Alberto and Highland Park entered into a written service agreement that specified D'Alberto was to provide preventative maintenance for certain HVAC equipment two times annually (April and October) for a total price of $300.00 annually in two installments of $150.00 each.

4. In addition, Highland Park would from time to time ask D'Alberto to do other work at the Highland Park facility.

5. There was no written contract for any of the other work.

6. There were two kitchen exhaust fans on the roof over the kitchen.

7. The fans were about five and one half feet apart and approximately ten feet above the kitchen cooking line.

8. The fans, duct work, hood and cooking line were not part of the HVAC equipment and were not covered by the preventative maintenance service agreement.

9. Previously, Highland Park had asked D'Alberto to look at and repair one of the kitchen exhaust fans in April 2006.

10. At that time, when he took the fan apart, the president of D'Alberto–David D'Alberto–observed what he believed to be "an old beat up dried out belt" that appeared to him "as though it had been sitting there for a long time." (*Compare* Dkt. No. 65, Attach. 1, at ¶ 3 [D'Alberto Affid., asserting fact] *with* Dkt. No. 59, Attach. 14, at 24 [Janowski Dep., not controverting fact].)

11. Based on that observation, Mr. D'Alberto believed that the fan had not been running for a quite a while. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 3 [D'Alberto Affid.] *with* Dkt. No. 59, Attach. 14, at 24 [Janowski Dep.] *and* Dkt. No. 59, Attach. 22, at 15 [Nadherny Dep.].)

12. Mr. D'Alberto repaired the fan by replacing a pulley and installing a new belt. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 3 [D'Alberto Affid.] *with* Dkt. No. 69, Attach. 2, at ¶ 13 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

13. No one stated to Mr. D'Alberto that the fan had not been working for an extended period of time, or that the cooking procedures in the kitchen had been altered or changed as a result of that fact. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 3 [D'Alberto Affid., asserting fact] *with* Dkt. No. 59, Attach. 14, at 24 [Janowski Dep., not controverting fact].)

14. Mr. D'Alberto was not aware of other problems with the kitchen exhaust fans until the weekend before the fire of September 4, 2007. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 4 [D'Alberto Affid.] *with* Dkt. No. 69, Attach. 2, at ¶ 15 [Plf.'s Rule 7.1 Response, not citing any record evidence in support of denial].)

15. On Tuesday, September 4, 2007, Mr. D'Alberto went to Highland Park to see if the fan could be repaired , arriving at approximately 12:30 pm. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 69, Attach. 2, at ¶ 16 [Plf.'s Rule 7.1 Response, not citing any record evidence in support of denial].)

16. Mr. D'Alberto went up on the roof to check out the fan and found it was the same fan he had repaired in April 2006.

17. Mr. D'Alberto took the cover or shroud off the fan to see what was wrong.

18. The fan had a broken bearing and broken belt. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 62, Attach. 6, at 47-48 [Dempsey Dep., not controverting fact but, at most, merely disclaiming knowledge of fact].)

19. John Janowski joined Mr. D'Alberto on the roof.

20. Mr. D'Alberto stated that he would not be able to do anything with the fan there that day, and that the fan had to go back to the shop for repair. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] with *with* Dkt. No. 59, Attach. 14, at 35 [Janowski Dep.].)

21. Mr. Janowski told Mr. D'Alberto to do whatever had to be done. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 59, Attach. 14, at 34-45 [Janowski Dep., not actually controverting fact].)

22. After receiving what he perceived to be clearance from Mr. Janowski, Mr. D'Alberto removed the fan assembly and blower, and took the assembly and blower back to the shop for repair. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 59, Attach. 14, at 34-45 [Janowski Dep., not controverting fact] *and* Dkt. No. Dkt. No. 69, Attach. 5, at 14-15 [Report of Investigative Associates, not controverting fact].)

23. The other kitchen exhaust fan was operating normally that day. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 69, Attach. 2, at ¶ 24 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

24. Mr. D'Alberto was there about 10 to 15 or perhaps 20 minutes that day. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 69, Attach. 2, at ¶ 25 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

25. While he was on the roof inspecting and working on the fan that day, Mr. D'Alberto did not smell any cooking and did not observe any smoke or heat coming through the duct. (*Compare* Dkt. No. 65, Attach. 1, at ¶ 5 [D'Alberto Affid.] *with* Dkt. No. 69, Attach. 2, at ¶ 27 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

26. D'Alberto had no written agreement with Highland Park with regard to any aspect of the kitchen fire suppression system at Highland Park.

27. D'Alberto had no obligation to inspect the fire suppression system at Highland Park. (*Compare* Dkt. No. 61, Attach. 12, at 78 [Valentine Dep.] *with* Dkt. No. 69, Attach. 2, at ¶ 29 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

28. D'Alberto had no written obligation to do anything with respect to the fire suppression system at Highland Park.

29. Pursuant to Paragraph 4.1.5. of NFPA 96, Highland Park had the "ultimate responsibility" for inspection and maintenance of the ventilation control and fire protection of the commercial cooking operation unless the responsibility was transferred in written form to another party. (*Compare* Dkt. No. 61, Attach. 12, at 79-80 [Valentine Dep., asserting fact] and Dkt. No. 61, Attach. 9, at 47 [NFPA 96, asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 31 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

30. The ultimate responsibility of Highland Park referred to in the preceding sentence was not transferred in written form to D'Alberto.  (*Compare* Dkt. No. 61, Attach. 12, at 80-81 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 32 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

31. D'Alberto did not have a written contract relating to the repair of the exhaust fan.

32. The involvement of D'Alberto with the kitchen exhaust systems was the repair of the fan in April 2006, the call about a fan over the September 2007 Labor Day weekend, and the attempt to repair on September 4, 2007.

33. That day, before the fire, the Highland Park cook, Joseph Nadherny, had just completed partly cooking chicken in preparation for the upcoming meal service.

34. Mr. Nadherny had partly cooked a bag (10-13 pieces) of eight-ounce half breasts shortly before the fire.

35. Total cook time for the chicken had been five to seven minutes.

36. The staff of Highland Park was not cooking to serve anyone in the dining room immediately before the fire.

37. None of the chicken was served that day.  (*Compare* Dkt. No. 59, Attach. 22, at 48 [Nadherny Dep.] *with* Dkt. No. 69, Attach. 2, at ¶ 40 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

38. That day, before the fire, nothing else had been cooked in the kitchen.

39. Cooking had been very minimal.

40. There had been no indication of anything abnormal in the operation of the grill, microwave, convection oven or deep fryer.  (*Compare* Dkt. No. 59, Attach. 22, at 55-56 [Nadherny Dep., asserting fact] *with* Dkt. No. 59, Attach. 22, at 28 [Nadherny Dep., not controverting fact].)

41. No smoke had been observed that day (before the fire), nor had any smoke been observed when the fan had not been operating over the prior weekend.

42. As Mr. Nadherny was cooking the chicken on the char broiler, he felt warmer than he would have felt had the fan been on (or the char broiler had not been on), but he did not feel "unusually" warm.  (*Compare* Dkt. No. 59, Attach. 22, at 119-20 [Nadherny Dep., asserting fact] *and* Dkt. No. 63, Attach. 2, at 31 [Murphy Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 45 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

43. There was nothing on the grill immediately before the fire.  (*Compare* Dkt. No. 59, Attach. 22, at 31-33 [Nadherny Dep., asserting fact, as well as the fact that he had cleaned the grill before going outside for a cigarette] *and* Dkt. No. 63, Attach. 2, at 113 [Murphy Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 47 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

44. No unusual odors or fumes had been observed that day or when the fan was not operating over the prior weekend.  (*Compare* Dkt. No. 63, Attach. 2, at 31, 53-54 [Murphy Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 48 [Plf.'s Rule 7.1 Response, not citing any evidence controverting this fact].)

45. No one from Highland Park said anything to Plaintiff's fire investigator Gerald Kufta ("Kufta") about noticing any odor, heat or fumes backing up before the fire. (*Compare* Dkt. No. 59, Attach. 25, at 84 [Kufta Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 49[Plf.'s Rule 7.1 Response, admitting this fact] *and* Dkt. No. 63, Attach. 2, at 31 [Murphy Dep., not controverting fact of what Kufta was, or was not, told].)

46. Mr. Kufta did not inquire about whether the kitchen had been used in the past with only one operating fan. (*Compare* Dkt. No. 59, Attach. 25, at 92 [Kufta Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 50 [Plf.'s Rule 7.1 Response, admitting this fact, and not citing any record evidence that actually controverts the fact].)

47. Mr. Kufta did not do any calculations to determine whether the ambient air would have been lowered or cooler if both fans had been operating. (*Compare* Dkt. No. 59, Attach. 25, at 88-89 [Kufta Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 52 [Plf.'s Rule 7.1 Response, admitting this fact, and not citing any record evidence that actually controverts the fact].)

48. Mr. Kufta did not calculate the airflow rate into the duct from which the fan assembly had been removed in his evaluation of the fire.

49. The airflow rate into the duct from which the fan assembly had been removed could be calculated.

50. Other than his experience, Mr. Kufta cannot provide any scientific basis for his opinion that, on the day of the fire, the airflow up from the cookline was reduced considerably because one fan was not operating (and because of the amount of air that the other fan was drawing through the other vent). (*Compare* Dkt. No. 59, Attach. 25, at 96 [Kufta Dep., asserting fact] *and* Dkt. No. 59, Attach. 25, at 16, 88-89 [Kufta Dep., not actually controverting fact].)

51. Mr. Kufta did not do any calculations to determine to what extent, if at all, the airflow was changed with only one operating fan. (*Compare* Dkt. No. 59, Attach. 25, at 127 [Kufta Dep., asserting fact] *and* Dkt. No. 59, Attach. 25, at 16, 88-89 [Kufta Dep., not actually controverting fact].)

52. In his deposition, Mr. Kufta testified that Plaintiff's witness, James Valentine, did calculations of the airflow rate into the duct from which the fan assembly had been removed. (*Compare* Dkt. No. 59, Attach. 25, at 124-25 [Kufta Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 57 [Plf.'s Rule 7.1 Response, not citing any specific record evidence controverting the fact].)

53. Mr. Valentine did not do the precise calculations referred to by Mr. Kufta (i.e., calculations of the necessary airflow rate and reduced airflow rate into the duct from which the fan assembly had been removed); rather, Mr. Valentine relied on the fact that, based on an industry standard formula for designing wall-mounted ventilation hoods (i.e., length times width times 100), the size of the two hoods in question indicated that 4800 cubic feet per minute would have been required for proper air flow (and thus the non-operation of one of the two fans would have resulted something less than the necessary 4800 cubic feet of air flow per minute in the remaining fan). (*Compare* Dkt. No. 61, Attach. 12, at 96, 105 [Valentine Dep., asserting former fact] *with* Dkt. No. 61, Attach. 7, at 87-88 [Valentine Dep., not controverting former fact, and asserting latter fact] *and* Dkt. No. 61, Attach. 12, at 92-93 [Valentine Dep., not controverting former fact, and asserting latter fact].)

54. Mr. Valentine had reviewed Mr. Kufta's report before it was finalized; and Mr. Valentine did not have any objections to anything in it.

55. Mr. Valentine at least in part relied upon Mr. Kufta's report when he prepared his report.

56. Mr. Valentine does not cite any specific code or standard to support the statement in paragraph "5" of his report that Mr. D'Alberto *failed* to advise Highland Park of the hazard of

cooking with only one operational exhaust fan. (*Compare* Dkt. No. 61, Attach. 12, at 81-82 [Valentine Dep., asserting fact] *with* Dkt. No. 61, Attach. 7, at 18 [Valentine Dep., not controverting fact] *and* Dkt. No. 61, Attach. 12, at 82-83 [Valentine Dep., not controverting fact].)

57. In his deposition, Mr. Valentine testified that, if Mr. D'Alberto did not say anything about whether or not they should be cooking with only one operational exhaust fan, Mr. Valentine would not have rendered an opinion supporting a claim against Mr. D'Alberto. (*Compare* Dkt. No. 61, Attach. 12, at 81-82, 84 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 62 [Plf.'s Rule 7.1 Response, admitting fact, except to the extent it includes a legal conclusion].)

58. Mr. Valentine's opinion supporting a claim against Mr. D'Alberto is based entirely on his supposition that, in response to a question from the cook (Mr. Nadherny) regarding whether he could continue to cook with only one operational exhaust fan, Mr. D'Alberto responded that he could continue to cook, albeit lightly on only one side of the grill. (*Compare* Dkt. No. 61, Attach. 12, at 83-84, 89 [Valentine Dep., asserting fact] *with* Dkt. No. 59, Attach. 22, at 28 [Nadherny Dep., not controverting fact] *and* Dkt. No. 63, Attach. 2, at 35 [Murphy Dep., not controverting fact].)

59. Mr. Valentine does not cite any specific code or standard to support Plaintiff's claim against Defendant D'Alberto (other than the industry standard formula for designing wall-mounted ventilation hoods–length times width times 100–which indicates that the airflow through the two hoods in question would have been 4800 cubic feet per minute, had they both been working). (*Compare* Dkt. No. 61, Attach. 12, at 84 [Valentine Dep., asserting fact] *with*

Dkt. No. 61, Attach. 7, at 18 [Valentine Dep., not controverting fact] *and* Dkt. No. 61, Attach. 12, at 82-83 [Valentine Dep., not controverting fact].)

60. Mr. Valentine did not do any calculations to determine the amount of the reduction of cubic feet of air movement resulting from having only one operational exhaust fan. (*Compare* Dkt. No. 61, Attach. 12, at 96 [Valentine Dep., asserting fact] *with* Dkt. No. 61, Attach. 7, at 87 [Valentine Dep., not controverting fact] *and* Dkt. No. 61, Attach. 12, at 93 [Valentine Dep., not controverting fact].)

61. Moreover, Mr. Valentine does not intend to do any calculations like those (at least not in this case). (*Compare* Dkt. No. 61, Attach. 12, at 96-97 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 73 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

62. In order to *precisely* calculate the cubic feet of air movement per minute from a fan, it is necessary to know (among other things) the horsepower of the fan motor and the size of the blades of the fan (although it is possible to *approximate* the cubic feet of air movement per minute from a fan by multiplying its length times its width times 100). (*Compare* Dkt. No. 61, Attach. 12, at 94-95 [Valentine Dep., asserting fact] *with* Dkt. No. 61, Attach. 7, at 83 [Valentine Dep., not controverting fact].)

63. Mr. Valentine did not know either the horsepower of the motor or the size of the fan blades. (*Compare* Dkt. No. 61, Attach. 12, at 95 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 67 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

64. In his deposition, Mr. Valentine testified that the "criteria" or "formula" he used to determine airflow moving through a system was a "rule of thumb," which was "non-scientific"

and "very simplistic" in nature. (*Compare* Dkt. No. 61, Attach. 12, at 93, 95-96 [Valentine Dep., asserting fact] *and* Dkt. No. 61, Attach. 7, at 87-88 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 68 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

65. Mr. Valentine did not attempt to calculate what air movement would have been required if all the appliances in the kitchen had been in operation. (*Compare* Dkt. No. 61, Attach. 12, at 97 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 70 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

66. Mr. Valentine did not attempt to calculate what air movement would have been required if various of the appliances in the kitchen had been in operation. (*Compare* Dkt. No. 61, Attach. 12, at 97 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 69 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

77. Mr. Valentine did not attempt to calculate what air movement would have been required if there had been just some chicken being cooked the day of the fire. (*Compare* Dkt. No. 61, Attach. 12, at 97 [Valentine Dep., asserting fact] *with* Dkt. No. 69, Attach. 2, at ¶ 71 [Plf.'s Rule 7.1 Response, not citing any record evidence disputing fact].)

## 2. Undisputed Material Facts on Defendant Jerome's Motion

The following facts have been asserted and supported by Defendant Jerome in its Rule 7.1 Statement and either expressly admitted by Plaintiff or denied by Plaintiff without a supporting record citation in its Rule 7.1 Response. (*Compare* Dkt. No. 66, Attach. 1 [Def. Jerome's Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 2 [Plf.'s Rule 7.1 Response].) Again, docket citations given below are to the screen number shown on the docket, not the page number listed on the document.

1. Plaintiff filed this action as subrogee of its insured, Highland Park.

2. The subrogation claim was made in regard to a fire that occurred on September 4, 2007 ("the fire"), at Highland Park's kitchen and clubhouse.

3. At the time of the fire, the kitchen at Highland Park contained a stainless steel ventilation hood, which was over the open grate grill of the cooking line, and which was (intended to be) protected by an Ansul fire suppression system ("Ansul system"). (*Compare* Dkt. No. 57, Attach. 1, at ¶ 18 [Plf.'s Compl., asserting fact] *with* Dkt. No. 60, Attach. 1, at 50 [Valentine Affid., not controverting fact].)

4. On September 4, 2007, the fire started on the open grate grill in the commercial kitchen of the Highland Park clubhouse. (*Compare* Dkt. No. 57, Attach. 1, at ¶ 18 [Plf.'s Compl., asserting fact] *with* Dkt. No. 73, Attach. 2, at ¶ 12 [Plf.'s Rule 7.1 Response, not supporting denial with specific record citation].)

5. As a result of the fire, Plaintiff initially paid $2,196,592.11 to Highland Park. The total of this amount was $2,254,742.12 as of June 3, 2010.

6. From 1987 to 2001, Sanford & Burtis performed Ansul system inspections at Highland Park. (*Compare* Dkt. No. 58, Attach. 27, at 62, 193 [Burtis Dep., asserting fact] *with* Dkt. No. 73, Attach. 2, at ¶ 14 [Plf.'s Rule 7.1 Response, not supporting denial with accurate record citations].)

7. On June 24, 2005, a letter agreement was entered into by Highland Park and ABJ Fire regarding a quote for two semi-annual inspections of the Ansul system at Highland Park ("the 2005 agreement"). (*Compare* Dkt. No. 58, Attach. 2, at 2 [Ltr. of June 24, 2005] *with* Dkt. No. 73, Attach. 2, at ¶ 15 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citations].)

8. On or about July 21, 2005, at ABJ Fire's request, Jerome Fire Equipment Company ("Jerome") submitted a quote to perform a semi-annual inspection of the Ansul system at Highland Park for a price of $80.

9. ABJ Fire accepted this quote from Jerome by telephone and then requested Jerome perform an inspection of the Ansul system at Highland Park.

10. The arrangement between Jerome and ABJ Fire did not call for specific inspection dates of the Ansul system. (*Compare* Dkt. No. 59, Attach. 15, at 68 [Rizzo Dep., asserting fact] *with* Dkt. No. 73, Attach. 2, at ¶ 18 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citations].)

11. ABJ Fire would schedule semi-annual Ansul system inspections by contacting Jerome

and determining a date that was agreeable with Highland Park. (*Compare* Dkt. No. 59, Attach. 15, at 57, 68 [Rizzo Dep., asserting fact] *with* Dkt. No. 73, Attach. 2, at ¶ 19 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citations].)

12. Jerome first performed an Ansul inspection at Highland Park on July 27, 2005. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 20 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 20 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citation].)

13. The next Ansul system inspection performed by Jerome at ABJ Fire's request was on February 20, 2006. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 21 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 21 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citation].)

14. Sometime in 2006 a fire occurred at the Highland Park kitchen ("the 2006 fire") when butter boiled over the side of a pan and caught fire.

15. During the 2006 fire, the Ansul system automatically triggered along the entire cooking line and extinguished the fire.

16. Soon after the 2006 fire, Highland Park inquired as to whether Jerome would recharge

the Ansul system, but Jerome was unable to schedule the work at that time.

17. Sanford & Burtis performed the recharge of the Ansul system on June 28, 2006. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 25 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 25 [Plf.'s Rule 7.1 Response, either not denying fact or not supporting denial with accurate or specific record citation].)

18. On August 7, 2006, ABJ Fire and Highland Park agreed to another one-year agreement for two semi-annual Ansul inspections ("the 2006 agreement"). (*Compare* Dkt. No. 66, Attach. 1, at ¶ 26 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation, misdesignated as Exhibit "19" instead of Exhibit "73"] *with* Dkt. No. 73, Attach. 2, at ¶ 26 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citation].)

19. A third and final inspection of the Ansul system was performed by Jerome at ABJ Fire's request on August 15, 2006. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 27 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 27 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citation].)

20. Jerome was never contacted by anyone to do an Ansul inspection at Highland Park after August 15, 2006.

21. The representative handling the Highland Park account at ABJ Fire, Michael Rizzo, left employment with ABJ Fire in April of 2007, before the Ansul inspection agreement with Highland Park would have been up for renewal.

22. There was no agreement between ABJ Fire and Highland Park concerning inspections of the Ansul system after the expiration of the 2006 agreement.

23. On May 30, 2007, Thomas Nash of T&N Cleaning Company performed a cleaning of the exhaust system at the Highland Park kitchen. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 31 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 31 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or specific record citation].)

24. Stanley Kolonko was the kitchen manager and chef at Highland Park at the time of the fire.

25. Mr. Kolonko testified that the cooking line in the Highland Park kitchen included the following: a grill; two deep fryers; a six-burner stove with an oven; and (in a nearby room) a convection oven, walk-in cooler, and preparation equipment. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 33 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 33 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citations].)

26. Mr. Kolonko testified that, if one were facing the cooking line, the line would have appeared to consist of the following, from left to right: two deep fryers, the grill, the stove, the oven, and the range. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 34 [Def. ABJ Fire's Rule 7.1

Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 34 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citations].)

27. The kitchen and clubhouse was equipped with five portable fire extinguishers. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 35 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 35 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citations].)

28. Underneath the hood, and above the cooking line, the Highland Park kitchen was equipped with an Ansul R-102 fire suppression system. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 36 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 36 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citation].)

29. The Ansul R-102 fire suppression system could be activated manually at a pull station in the kitchen, or activated automatically based on a temperature setting that would trigger

the fusible links in the system.

30. A manual activation would generally trigger the system earlier than an automatic activation. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 38 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 38 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citation].)

31. The weekend prior to the fire, Robert Murphy, the head chef at Highland Park, noticed the kitchen was warmer than it usually was because an exhaust fan at the top of one of the exhaust ducts was not working properly. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 39 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No.

73, Attach. 2, at ¶ 39 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citation].)

32. On September 2, 2007, David D'Alberto received a call from Mr. Murphy who asked Mr. D'Alberto to repair the exhaust fan.

33. On September 4, 2007, Mr. D'Alberto arrived at Highland Park, went onto the roof, and diagnosed the problem with the exhaust fan as being related to a broken bearing on the "blower part" due to old age of the equipment.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 41 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 41 [Plf.'s Rule 7.1 Response, not supporting denial with any accurate record citation].)

34. Mr. D'Alberto took off the shroud and cover of the fan, removed the assembly, and removed the fan and the blades intending to transport them to his shop for repair.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 42 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 42 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

35. On the day of the fire, Joseph Naderny, a cook at the Highland Park kitchen, arrived to work at around 10:30 a.m. or 11:00 a.m.

36. Mr. Naderny was the only cook working that day.

37. Mr. Naderny turned the grill on because he had arrived in the kitchen before anyone else.

38. Mr. Naderny turned on the fans, but noticed they did not sound as they usually did. Shortly thereafter, Mr. Naderny was informed that a repair man would be coming to check the fans that day.

39. Both Mr. Kolonko and Mr. Naderny were told that one of the exhaust fans would not be operating that day. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 47 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 47 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

40. After the fan was removed and shortly before the fire, Mr. Naderny cooked chicken breasts on the grill. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 48 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 48 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

41. Mr. Naderny testified that after removing the chicken breasts from the grill, he brushed the grates of the grill, then scraped them with a grill brush.

42. Mr. Nadherny then left the kitchen unattended to join a waitress, Ms. Sasha Lee Dunn, outside the building for a cigarette while the grill burner was set to "high." (*Compare* Dkt. No. 66, Attach. 1, at ¶ 50 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 50 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

43. Mr. Nadherny testified that he was outside with Ms. Dunn for about two minutes before returning to the kitchen.

44. Upon entering the kitchen, Mr. Nadherny "saw the back wall on fire, more top heavy than bottom heavy, like[] the fire was already into the hoods and onto the back wall, . . . [which was] stainless steel"; he observed the fire in the hood and onto the back wall above the char grill along with grey-colored smoke. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 52 [Def. ABJ Fire's Rule

7.1 Statement, asserting facts supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 52 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

45. The fire was around eight to ten feet in width; Mr. Nadherny did not notice any flames on the grill itself or on the fryers or the stove.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 53 [Def. ABJ Fire's Rule 7.1 Statement, asserting facts supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 53 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

46. Mr. Nadherny obtained a fire extinguisher and tried to spray "anything he could"; by this time, the Ansul system had already activated on its own.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 54 [Def. ABJ Fire's Rule 7.1 Statement, asserting facts supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 54 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

47. The Ansul system activated automatically along the entire cook line.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 55 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2 [Plf.'s Rule 7.1 Response, omitting Paragraph 55].)

48. Gerald Kufta was offered as an expert witness by Plaintiff to determine the origin and cause of the fire.

49. Mr. Kufta testified as follows, with regard to the cause of the fire: (1) the removal of one of the fans in the exhaust system caused the system to fail to take the heat up and out from the cooking appliances; and (2) as a result of the heat remaining around the grill, temperatures rose to a sufficient level where the grease in the grill and on the back wall ignited.  (*Compare*

Dkt. No. 66, Attach. 1, at ¶ 57 [Def. ABJ Fire's Rule 7.1 Statement, asserting facts supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 57 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

50. Mr. Kufta also testified that, without the fan's presence, the grease near the grill along the wall ignited. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 58 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 58 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

51. Mr. Kufta testified that the Ansul system could not have put the fire out at Highland Park because it was not designed to put a fire out on the wall. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 59 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 59 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation that was either accurate or material].)

52. Mr. Kufta testified that the Ansul system "would have put the fire out in the hood and on top of the grill but it would not have put the fire out behind the hood." (*Compare* Dkt. No. 66, Attach. 1, at ¶ 60 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 60 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

53. James Valentine was offered by Plaintiff to evaluate the suppression system and the ventilation system to determine how the cooking fire caused a loss of the Highland Park building. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 61 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 61 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

54. According to Mr. Valentine, the kitchen at Highland Park included a cooking line that was vented and covered by an 8-foot 11-inch by 36-inch ventilation hood that had an additional 56-inch by 36-inch hood attached. The hood and addition covered all of the cooking appliances.

55. Mr. Valentine estimated that the hood was installed sometime in the 1960's.

56. Mr. Valentine testified that sometime between 2001 and 2005 the three-gallon Ansul system in the Highland Park kitchen had been replaced with a six-gallon system. Highland Park has not produced any records identifying who performed this change, why this change was made, or precisely when it was done.

57. Mr. Valentine testified that there was an eight-inch "gap" between the ventilation hood and the wall, behind the appliances, at the Highland Park kitchen. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 65 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 65 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

58. Mr. Valentine testified that the gap between the ventilation hood above the cooking line and the wall was covered by a sheet metal barrier which ran along the length of the hood and was attached by sheet metal screws. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 66 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 66 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

59. Mr. Valentine opines that Jerome failed its duties as an Ansul inspector in two manners: (1) failing to inspect and warn of non-liquid tight welds at the duct collar in the hood; and (2) failing to warn of a gap between the hood and the back wall of the kitchen. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 67 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by

accurate record citations] *with* Dkt. No. 73, Attach. 2, at ¶ 67 [Plf.'s Rule 7.1 Response, not

supporting denial with record citations that were either accurate or material].)

60. Mr. Valentine testified that he is not of the opinion that the hood was required to be

mounted flush against the wall and that the clearance, if any, required between the hood and the

wall depends on the type of construction behind the wall; Mr. Valentine testified that an Ansul

inspector would not be required to dismantle the wall to determine the nature of the construction

material used. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 68 [Def. ABJ Fire's Rule 7.1 Statement,

asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 68 [Plf.'s

Rule 7.1 Response, not supporting denial with record citations that were either accurate or

material].)

61. Mr. Valentine testified that the standards of the National Fire Protection Association

known as NFPA 96 and 17A were either industry standards or were the law in the State of New

York at the relevant time periods.   (*Compare* Dkt. No. 66, Attach. 1, at ¶ 69 [Def. ABJ Fire's

Rule 7.1 Statement, asserting fact supported by accurate record citations] *with* Dkt. No. 73,

Attach. 2, at ¶ 68 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were

either accurate or material].)

62. Mr. Valentine testified that he is not offering any opinions that the Ansul system

did not perform as expected at the time of the fire.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 70

[Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citations] *with*

Dkt. No. 73, Attach. 2, at ¶ 70 [Plf.'s Rule 7.1 Response, not supporting denial with record

citation that was either accurate or material].)

63. Mr. Valentine testified that the Ansul system extinguished the fire within the

ventilation system. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 71 [Def. ABJ Fire's Rule 7.1

Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 71 [Plf.'s Rule 7.1 Response, not supporting denial with record citation that was either accurate or material].)

64. Mr. Valentine testified that an Ansul system could not be expected to put out fires that are outside the area of protection of the system. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 72 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 72 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

65. Mr. Valentine testified that an Ansul system is not designed to extinguish a fire on the back wall of a kitchen cook line. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 73 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 73 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

66. The standards for a semi-annual Ansul suppression system inspection are addressed in Paragraph 7.3 of NFPA 17A. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 74 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 74 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

67. Mr. Valentine opined that an entity conducting an Ansul system inspection has a duty to inspect and warn with respect to the installation of the hood and duct work. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 75 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 75 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

68. NFPA 96 provides that cooking equipment shall not be operated while the exhaust system is non-operational or otherwise impaired. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 76 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 76 [Plf.'s Rule 7.1 Response, not supporting denial with record citation that was either accurate or material].)

69. Mr. Valentine is of the opinion that Highland Park was in violation of the provisions of the NFPA on the day of the fire and that there should have been no cooking taking place because the exhaust fan had been removed. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 77 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 77 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

70. In regard to Jerome's alleged failure to warn of the gap, Mr. Valentine testified that Jerome's alleged duty to warn of the gap included a duty to warn "that [the gap] existed." (*Compare* Dkt. No. 66, Attach. 1, at ¶ 78 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 78 [Plf.'s Rule 7.1 Response, asserting fact supported by accurate record citation].)

71. Mr. Valentine testified and agreed with the fact that, "if Highland Park was already aware of the gap, then there was no need to warn [Highland Park of the gap]." (*Compare* Dkt. No. 66, Attach. 1, at ¶ 79 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 79 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

72. Mr. Valentine testified that the non-liquid tight welds were located on the outside of the ventilation duct of the hood and that the perimeter weld would not be visible to someone inspecting the hood system from the floor, although it might be visible to someone from a

different position (such as standing on top of the kitchen equipment, removing the filters, and looking up with a flashlight).  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 80 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 80 [Plf.'s Rule 7.1 Response, asserting fact supported by accurate record citations].)

73. Mr. Valentine testified that a person inspecting the hood system according to the NFPA would not be able to see the "flange" welded to the outside of the duct.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 81 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 81 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

74. Robert Murphy testified that he worked as a chef at the Highland Park kitchen for eight years and for more than six years prior to the fire.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 82 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 82 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

75. Mr. Murphy testified that there was a gap between the cooking line and the wall, and that grease, dirt, and grime would sometimes build up on the wall.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 83 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 83 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

76. Mr. Murphy testified that his duties and other kitchen staffs' duties included cleaning the kitchen daily and wiping the back walls down every week.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 84 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 84 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

77. Mr. Murphy testified that, when the back wall was cleaned, someone had to go behind

the cooking line and clean it with degreaser.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 85 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 85 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

78. The equipment was pulled out away from the wall, and kitchen staff would physically get behind the cooking line in order to clean.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 86 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 86 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

79. Mr. Murphy testified that kitchen staff would clean behind the equipment in stages, and that each section would take an hour to several hours to complete.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 87 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 87 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

80. Behind the cooking line, kitchen staff would clean the metal wall up to the hood by hand, rag, or scraper.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 88 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 88 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

81. In order to clean behind the cooking area, Mr. Murphy testified that kitchen staff needed to visibly look at the space he or she was cleaning.  (*Compare* Dkt. No. 66, Attach. 1, at ¶ 89 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 89 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

82. Mr. Murphy testified that nothing prevented an employee from seeing the joint between the hood and the wall. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 90 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 90 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

83. Mr. Murphy testified that the sheet metal between the opening and the wall was something he or kitchen staff would clean. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 91 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 91 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

84. Mr. Murphy testified that, if there was a pipe penetrating the sheet metal between the hood and the wall, kitchen staff would clean around it; and they would have been aware that there was an opening in that portion of the sheet metal for a pipe to pass through. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 92 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 92 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

85. Mr. Murphy stated kitchen staff would clean and remove grease in the hood down to bare metal and would have noticed any screws attaching the hood to the wall. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 93 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 93 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

86. Mr. Valentine testified that, if one were to clean the back wall, one would have also cleaned the stainless steel between the hood and the wall. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 94 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 94 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

87. Mr. Valentine testified that, if one cleaned the stainless steal, one would realize that there was a gap present. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 95 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 95 [Plf.'s Rule 7.1 Response, not supporting denial with record citations that were either accurate or material].)

88. Mr. Murphy testified that the reason employees of Highland Park used to clean the wall behind the cooking line was so that the grease "didn't catch on fire." (*Compare* Dkt. No. 66, Attach. 1, at ¶ 96 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 96 [Plf.'s Rule 7.1 Response, not supporting denial with record citation that was either accurate or material].)

89. Mr. Valentine testified that NFPA 96 was to be "taken as a united whole." Mr. Valentine stated that Section 1.l of NFPA 96 states that "[t]hese requirements cover the performance during fire tests of pre-engineered fire extinguishing system units intended for the protection of restaurant cooking areas." It also states that "[t]his standard shall be applied as a united whole."

90. When asked about the duties of a cleaning professional performing fire-prevention work according to NFPA 96, Mr. Valentine admitted that the kitchen cleaner would not be responsible for Operating Procedures (Section 11.1) or Inspection of Fire-Extinguishing Systems (Section 11.2). (*Compare* Dkt. No. 66, Attach. 1, at ¶ 98 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 98 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

91. Mr. Valentine testified that he would not expect someone working on the exhaust fan to perform an Ansul inspection pursuant to NFPA 96. (*Compare* Dkt. No. 66, Attach. 1, at ¶ 99

[Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 99 [Plf.'s Rule 7.1 Response, not supporting denial with a record citation].)

92. NFPA 17A specifically provides the standards relating to "wet chemical extinguishing systems."   (*Compare* Dkt. No. 66, Attach. 1, at ¶ 100 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 100 [Plf.'s Rule 7.1 Response, not supporting denial with record citation that was either accurate or material].)

93. Mr. Valentine testified that an "inspection" under NFPA 17A requires a "visual examination of a system or portions thereof to verify that it appears to be in operating condition and free of physical damage." (*Compare* Dkt. No. 66, Attach. 1, at ¶ 101 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 101 [Plf.'s Rule 7.1 Response, not supporting denial with record citation that was either accurate or material].)

94. Mr. Valentine further testified such an "inspection" pursuant to NFPA 17A "is done by seeing that the system is in place, that it has not been activated or tampered with, and that there is no obvious physical damage or condition to prevent operation."   (*Compare* Dkt. No. 66, Attach. 1, at ¶ 102 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact supported by accurate record citation] *with* Dkt. No. 73, Attach. 2, at ¶ 102 [Plf.'s Rule 7.1 Response, not supporting denial with record citation that was either accurate or material].)

95. Mr. Valentine testified that he was unaware of any provision in the section of the Ansul manual regarding the procedure for recharging and resetting the Ansul fire suppression system (attached as Dkt. No. 61, Attach. 15) that requires a company that is recharging the system to inspect the duct work or the ventilation system.

96. Mr. Valentine testified that the fire suppression system under the hood should be inspected on a yearly basis by the "authority having jurisdiction." (*Compare* Dkt. No. 61, Attach. 12, at 33-34 [Valentine Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 104 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

97. Mr. Valentine testified that, during the installation of the hood in this case, the "authority having jurisdiction" (at least during the pendency of the installation) was the Town of Sennett construction office. (*Compare* Dkt. No. 61, Attach. 12, at 33-34 [Valentine Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 105 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

98. In his written report, Russell Fleming, P.E., opined that "neither of [the passages cited by Mr. Valentine] can be interpreted [as] plac[ing] any responsibilities or duties on Jerome Fire Equipment Co., but are instead aimed at someone enforcing or otherwise applying the full document." (*Compare* Dkt. No. 62, Attach. 5, at 4 [Fleming Expert Report, asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 106 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

99. In his deposition, Mr. Fleming testified that Section 11.2 of NFPA 96 is the only section applicable to Jerome with respect to the[ir] work performed at Highland Park. (*Compare* Dkt. No. 62, Attach. 1, at 77 [Fleming Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 107 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

100. Also in his deposition, Mr. Fleming testified that "[t]here is a division of labor that's intended, and can be seen in the structure of the standard. If it was the intent of the committee that one party be responsible for hood inspection, cleaning, and inspection of the fire system, they certainly have it within their purview to write a section that requires some entity to be in charge of all of those things together." (*Compare* Dkt. No. 62, Attach. 1, at 125 [Fleming Dep.,

asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 108 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

101. Finally, in his deposition, Mr. Fleming testified that "[Ansul systems inspectors] are not there to provide a hood inspection." (*Compare* Dkt. No. 62, Attach. 1, at 88 [Fleming Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 109 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

### 3.    Undisputed Material Facts on Defendant ABJ Fire's Motion

The following facts have been asserted and supported by Defendant ABJ Fire in its Rule 7.1 Statement and either expressly admitted by Plaintiff or denied by Plaintiff without a supporting record citation in its Rule 7.1 Response.  (*Compare* Dkt. No. 67, Attach. 1 [Def. ABJ Fire's Rule 7.1 Statement] *with* Dkt. No. 72, Attach. 2 [Plf.'s Rule 7.1 Response].)  Again, docket citations given below are to the screen number shown on the docket, not the page number listed on the document.

1. The Highland Park Golf Course was created in 1925.

2. The 18 hole golf course is situated on 132 acres of land.

3. The clubhouse existing in 2007 was built in the 1940's or 1950's.

4. In the mid-1990's, the kitchen was enlarged and an addition was put on the clubhouse.

5. In 2007, the 13,500-square-foot clubhouse was equipped with a barroom, locker rooms, pro shop, dining room, grill room and kitchen.

6. The commercial kitchen was, at various times, equipped with two deep fry machines, an open char grill, a multi-burner stove and griddle.

7. Stainless steel flashing, the seams of which were riveted together, was on the wall behind the "cook line."   (*Compare* Dkt. No. 57, Attach. 17, at 36 [Basile Dep., asserting fact] *and* Dkt. No. 63, Attach. 2, at 72-74 [Murphy Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 7 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

8. A schematic drawing of the cook line prepared by Plaintiff's expert is reproduced at Exhibit 70 of the Joint Appendix to Defendants' motions.

9. A metal exhaust hood equipped with fans was installed over the cook line.  (*Compare* Dkt. No. 57, Attach. 18, at 35-36 [Basile Dep., asserting fact] *and* Dkt. No. 63, Attach. 2, at 25-26 [Murphy Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 9 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

10. None of the Highland Park witnesses could testify or produce documents establishing when or by whom the hood was initially installed.

11. Plaintiff's expert estimated the hood was installed in the 1960s.

12. A schematic drawing of the hood prepared by Plaintiff's expert is reproduced at Exhibit 86 of the Joint Appendix to Defendants' motions.

13. The hood was also equipped with an Ansul kitchen fire suppression system. (*Compare* Dkt. No. 59, Attach. 8, at 20 [Kolonko Dep., asserting fact] *and* Dkt. No. 57, Attach. 18, at 39 [Basile Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 13 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

14. It is believed by Steven Burtis that, sometime prior to 1987, the Ansul system was installed by Sanford Fire Apparatus (a company purchased by Sanford & Burtis in 1984 or 1985).  (*Compare* Dkt. No. 58, Attach. 27, at 29-31, 62-65 [Burtis Dep., asserting fact] *with* Dkt.

No. 72, Attach. 2, at ¶ 14 [Plf.'s Rule 7.1 Response, not controverting fact with accurate record citation].)

15. A schematic drawing of the Ansul system and kitchen hood configuration prepared by plaintiff's expert is reproduced at Exhibit 87 of the Joint Appendix to Defendants' motions.

16. Generally, an Ansul system is designed to detect a fire on a commercial cooking surface, activate automatically or manually, and, upon discharge of a chemical agent, acts to suppress any fire located on the cooking appliances, in the exhaust ducts or in the plenum of the hood. (*Compare* Dkt. No. 58, Attach. 27, at 51 [Burtis Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 16 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

17. The Ansul system at Highland Park was equipped with a manual pull station.

18. When the manual pull station is pulled, a stainless steel cable running from the pull station to the Ansul control box will activate the system, causing a plunger to be depressed down into an actuation cartridge, pressurizing the chemical agent in the cylinder (tank) holding the agent then causing the chemical agent to flow through the supply lines in the system.

19. Generally, once the system is activated, it will dispense the chemical agent in the cylinder through the nozzles and saturate the entire cooking line, across the length of the plenum and into the ducts all at the same time. (*Compare* Dkt. No. 59, Attach. 59, at 120-21 [Provo Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 19 [Plf.'s Rule 7.1 Response, not controverting fact with accurate record citation].)

20. For automatic activation of the Ansul system, the temperature on the cooking surface would need to exceed the temperature rating of the fusible links located along the stainless steel

cable.  (*Compare* Dkt. No. 59, Attach. 59, at 123 [Provo Dep., asserting fact] *with* Dkt. No. 72,

Attach. 2, at ¶ 20 [Plf.'s Rule 7.1 Response, not supporting denial with accurate record citation].)

21. Tension is applied to the left and right of the fusible links and they are soldered in the

middle at certain temperature and designed to melt when that temperature is reached.

22. When the link melts, tension is lost in the stainless steel cable causing the plunger to

depress in to the actuation cartridge, pressurizing the cylinder and releasing the chemical agent

into the system where it would disperse the chemical through the nozzles.

23. The Ansul system is designed to suppress fires located on the cooking appliance

surfaces.  (*Compare* Dkt. No. 67, Attach. 1, at ¶ 23 [Def. ABJ Fire's Rule 7.1 Statement,

asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶

23 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

24. The Ansul system installed in the kitchen of the clubhouse of Highland Park was *not*

designed to suppress fire on the sheet metal on the rear wall of the cook line.  (Dkt. No. 61,

Attach. 12, at 20-23, 27, 46-48 [Valentine Dep., asserting fact]; Dkt. No. 61, Attach. 14, at 2

[Section I of Ansul manual, asserting fact].)

25. The hood in the kitchen of the clubhouse of Highland Park was mounted such that the

rear of the hood was approximately 6.5 inches from the rear wall of the kitchen.   (*Compare* Dkt.

No. 61, Attach. 7, at 64 [Valentine Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 25

[Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

26. The gap between the rear of the hood and the sheet-metal-covered back wall of the

kitchen was spanned by a strip of sheet metal that was riveted or screwed to both the hood and

the sheet-metal-covered back wall, and that ran the length of the hood.  (*Compare* Dkt. No. 61,

Attach. 7, at 63-67 [Valentine Dep.] *and* Dkt. No. 61, Attach. 12, at 29-30 [Valentine Dep.] *with* Dkt. No. 72, Attach. 2, at ¶ 26 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

27. Between March 1987 and February 2001, semi annual inspections of the Highland Park Ansul system were performed by Sanford & Burtis. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 27 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 27 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

28. The record on ABJ Fire's motion for summary judgment is devoid of any records possessed by Highland Park of any semi annual inspections of its Ansul system between March 2001 and June 2005. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 28 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 28 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

29. On or about June 24, 2005, Mike Rizzo of ABJ Fire met with a representative of Highland Park to survey the premises for inspection needs. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 29 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 29 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

30. On or about June 24, 2005, ABJ Fire forwarded a proposal to Highland Park for inspection and testing of the Highland Park Ansul system and fire extinguishers. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 30 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 30 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

31. Highland Park signed and returned the proposal on July 20, 2005. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 31 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 31 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

32. Because ABJ Fire did not have certified personnel or experience with Ansul system inspections, ABJ Fire subcontracted the inspections to Jerome Fire Equipment Company ("Jerome"). (*Compare* Dkt. No. 67, Attach. 1, at ¶ 32 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 32 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

33. The inspection agreements were to be renewed annually. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 33 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 32 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

34. The Ansul inspection agreement between ABJ Fire and Highland Park was renewed on or about August 7, 2006. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 34 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 34 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

35. Jerome's last inspection of the Highland Park Ansul system occurred on August 15, 2006. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 35 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 35 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

36. Highland Park did not renew the annual inspection agreement with ABJ Fire for 2007.

37. On June 28, 2006, a grease fire occurred on the Highland Park char grill when a cook burned a pan of butter.

38. On that occasion, the Ansul system operated automatically and extinguished the fire.

39. On June 28, 2006, Sanford & Burtis recharged the Highland Park Ansul system, following the activation by the grease fire.  (*Compare* Dkt. No. 67, Attach. 1, at ¶ 39 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 39 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

40. On September 4, 2007, one of the two exhaust fans (located over the open char grill) in the Highland Park kitchen hood was not working.

41. The fan had stopped working sometime during the prior holiday weekend.  (*Compare* Dkt. No. 67, Attach. 1, at ¶ 41 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 41 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

42. Highland Park cook Robert Murphy contacted D'Alberto Refrigeration ("D'Alberto") to advise it that the hood system was not working.

43. On September 4, 2007, D'Alberto arrived at Highland Park and went onto the roof to examine the exhaust fan.

44. After the president of D'Alberto, David D'Alberto, returned to ground level, Mr. D'Alberto advised Highland Park General Manager Stanley Kolonko that the fan motor was not working properly and would not be able to run.  (*Compare* Dkt. No. 59, Attach. 8, at 44-45 [Kolonko Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 44 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

45. Sometime in the early afternoon, Highland Park cook Joseph Naderny left the kitchen unattended with the open char grill burners on "high" and went outside with a co-worker for a break. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 45 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 45 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

46. Mr. Nadherny was aware that one of the exhaust hood fans was not working. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 46 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 46 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

47. When he returned two to three minutes later, Mr. Nadherny observed fire on the back wall of the kitchen, behind the cooking line. (*Compare* Dkt. No. 59, Attach. 22, at 36 [Nadherny Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 47 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

48. After shouting for help, Mr. Nadherny returned to the kitchen with a fire extinguisher and observed/felt the automatic activation of the Ansul system. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 48 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 48 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

49. As of the day of the fire, Mr. Nadherny had not received any fire response training from Highland Park and did not know the Ansul system was equipped with a manual pull station. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 49 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 49 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

50. Stanley Kolonko, Highland Park's General Manager/Chef between 2003 and 2007, testified that, before the fire, Highland Park staff performed "weekly" cleanings of the back wall behind the kitchen appliances, from at least the top of the cooking appliances up to the bottom of the exhaust hood. (*Compare* Dkt. No. 59, Attach. 8, at 15, 18, 90-91 [Kolonko Dep., asserting fact] *with* Dkt. No. 72, Attach. 2, at ¶ 50 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

51. Mr. Nadherny testified that he personally cleaned the back wall behind the cooking line on one or two occasions in 2007. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 51 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 51 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

52. Robert Murphy, a chef at Highland Park since 2001, testified that the back wall of the kitchen behind the cooking line would be cleaned on a monthly basis. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 52 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 52 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

53. Mr. Murphy testified that he personally cleaned the back wall at least 10-15 times during his tenure at Highland Park and also observed Mr. Kolonko clean the wall. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 53 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 72, Attach. 2, at ¶ 53 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

54. Mr. Murphy testified he would clean the entire area of the back wall up to the hood and that the entire area was readily visible. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 54 [Def. ABJ

Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 54 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

55. Mr. Murphy testified that the cleaning of the back wall included the sheet metal between the hood and the wall. (*Compare* Dkt. No. 67, Attach. 1, at ¶ 55 [Def. ABJ Fire's Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 72, Attach. 2, at ¶ 55 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

### 4.    Undisputed Material Facts on Defendant Sanford & Burtis' Motion

The following facts have been asserted and supported by Defendant Sanford & Burtis in its Rule 7.1 Statement and either expressly admitted by Plaintiff or denied by Plaintiff without a supporting record citation in its Rule 7.1 Response. (*Compare* Dkt. No. 68, Attach. 2 [Def. Sanford & Burtis' Rule 7.1 Statement] *with* Dkt. No. 71, Attach. 2 [Plf.'s Rule 7.1 Response].) Again, docket citations given below are to the screen number shown on the docket, not the page number listed on the document.

1. This case arises out of a fire that started at the open grate grill of the cooking line in the commercial kitchen of Plaintiff's insured, the Highland Park Golf Club, on September 4, 2007.

2. That fire eventually spread to the rest of the structure, resulting in the near total destruction of the clubhouse and its contents.

3. The cooking appliance line at Highland Park consisted of, from south to north, two frialators, a char griller, a ten-burner commercial cook stove, and a flat-top griddle.

4. Twenty-two-guage stainless steel sheet metal was on the wall behind the cook line, extending from the floor to the ceiling level. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 6 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 6 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

5. The open grate grill of the cooking line had a stainless steel hood over it. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 7 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 7 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

6. No one knows when the hood was installed or who installed it.

7. The hood was not mounted flush against the back wall of the kitchen; however, the gap between the wall and the hood was filled in with a stainless steel filler plate that ran the length of the hood. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 9 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 9 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

8. There were holes in the stainless steel filler plate through which pipes ran.

9. The hood was ventilated by two exhaust ducts that were connected to two exhaust fans located on the roof of the kitchen portion of the golf club.

10. On the morning of the fire, the exhaust fan that ventilated the duct over the end of the hood that was above the char griller was not working.

11. The fire started on or near the surface of the char griller.

12. The char griller was turned on "high" when the cook started his shift in the morning and was left on "high." (*Compare* Dkt. No. 59, Attach. 22, at 116-17 [Nadherny Dep., asserting

fact] *with* Dkt. No. 71, Attach. 2, at ¶ 14 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

13. In the early afternoon, the Highland Park cook, Joseph Nadherny, partially cooked approximately 10 to 13 boneless chicken breasts on the char griller. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 15 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 15 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

14. Thereafter, Mr. Nadherny put the chicken in a glass container, covered it with plastic wrap and put it in the microwave. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 16 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2 [Plf.'s Rule 7.1 Response, omitting response to Paragraph 16 of Def. Sanford & Burtis' Rule 7.1 Statement].)

15. While the chicken was in the microwave, Mr. Nadherny scraped the char griller down and then left the kitchen with one of the waitresses, Sasha Dunn, to go outside and smoke a cigarette.

16. After being outside a short period of time, Ms. Dunn reentered the kitchen and returned to her customers in the dining room–she did not pass through the part of the kitchen where the cook line was located.

17. Mr. Nadherny remained outside a little longer and then returned to the kitchen.

18. When Mr. Nadherny entered the kitchen, he noticed, about ten feet ahead of him, a lot of fire concentrated on the wall behind the cook line, the fire being about eight to ten feet wide and about ten feet off the ground, like the fire was already into the hood, above the grill. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 20 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting

fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 20 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

19. Mr. Nadherny also described the flames as seven to ten feet in width and ten feet in length and moving downward and out.

20. Mr. Nadherny ran over to the door to the dining room and yelled out to the bar keeper to call the fire department. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 22 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 22 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

21. Mr. Nadherny did not utilize the manual pull station for the system.

22. Instead, he began looking for a fire extinguisher.

23. He knew there was a fire extinguisher that was kept on a hook on the foot-long wall of the prep area that existed between the double doors between the kitchen and the dining room. (Dkt. No. 59, Attach. 22, at 90 [Nadherny Dep.].)

24. As he entered the kitchen, the automatic Ansul fire suppression system triggered.

25. At this point, Mr. Nadherny could not see flames anywhere due to the smoke.

26. Although units of the Owasco, Sennett and Auburn Fire Departments among others responded to the scene they were unable to contain the fire and the building was destroyed.

27. It is believed by the president of Sanford & Burtis, Steven Burtis, that, sometime prior to 1987, the Ansul system was installed by Sanford Fire Apparatus. (*Compare* Dkt. No. 68, Attach. 3, at ¶¶ 10, 11, 13 [Burtis Affid., asserting fact] *and* Dkt. No. 58, Attach. 27, at 29-31, 62-65 [Burtis Dep., asserting fact] *with* Dkt. No. 71, Attach. 2, at ¶ 30 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

28. Sanford & Burtis inspected the Highland Park Ansul kitchen fire suppression system from approximately 1987 to 2001.

29. In a report from an inspection on February 12, 2001, Sanford & Burtis indicated a number of areas where the system was non-compliant. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 33 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 33 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

30. A letter was sent to Highland Park advising it of the deficiencies noted in the inspection of February 12, 2001. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 34 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 34 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

31. In February 2001 (and, previously, in June 2000), Sanford & Burtis advised Plaintiff's insured, Highland Park, that it would have to perform extensive upgrades to the system in order to bring the system into compliance with current standards. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 35 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 35 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

32. Highland Park never contacted Sanford & Burtis to perform the upgrade, and never again contacted Sanford & Burtis to perform inspections of its Ansul system. (*Compare* Dkt. No. 68, Attach. 3, at ¶¶ 21, 24 [Burtis Affid., asserting fact] *with* Dkt. No. 71, Attach. 2, at ¶ 36 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

33. In 2005, Highland Park entered into a contract with ABJ Fire Protection Company ("ABJ Fire") to inspect and maintain all the fire suppression systems at Highland Park. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 37 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 37 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

34. In 2005, ABJ Fire subcontracted the inspection of the Ansul system in the Highland Park kitchen to Jerome Fire Equipment Company ("Jerome").

35. Jerome inspected the system on July 27, 2005, and found it to be in working order with the exception that the kitchen was not equipped with a K-class fire extinguisher and the filters being very soiled and not properly hung. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 39 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 39 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

36. On or about June 27, 2006, the system discharged as a result of a cook attempting to melt butter on the char griller.

37. The kitchen was unattended at the time of the June 2006 fire.

38. Because Jerome did not have anyone to perform a recharge immediately, Jerome contacted Sanford & Burtis to perform the recharge.

39. Sanford & Burtis performed a service call to recharge of the system on June 28, 2006. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 43 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 43 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

40. The report from the recharge indicates that the report resulted from a service call for a recharge only, and none of the 17 inspection boxes are marked. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 44 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 44 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

41. The service call to recharge the system on June 28, 2006, done at the request of Jerome, was the first time Sanford & Burtis had performed any work on or with the Ansul fire suppression system at Highland Park since February 12, 2001. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 45 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 45 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

42. After the service call to recharge the system on June 28, 2006, at the request of Jerome Fire, the next time a representative of Sanford & Burtis visited Highland Park was when Mr. Burtis attended an inspection of the fire scene in October 2007, at the request of Plaintiff's counsel. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 46 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 46 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

43. On August 22, 2006, Jerome conducted its scheduled inspection of the system.

44. That inspection report notes that the manual pull station was blocked by a cooler. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 48 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 48 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

45. In 2007, there was no contract in effect between Highland Park and ABJ Fire or any other fire suppression contractor for the inspection of the Ansul system in the Highland Park kitchen; and the August 2006 inspection performed by Jerome appears to have been the last inspection by a certified Ansul contractor prior to the fire.

46. Plaintiff also retained an expert to offer an opinion with regard to the operation of the kitchen's Ansul fire suppression system, the ventilation system, and the hood/duct cleaning.

47. According to Plaintiff's witness, James Valentine, the "ultimate responsibility for the ventilation suppression system [belongs to] the owner of the equipment." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 51 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 51 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

48. There is no requirement in NFPA 96 that the owner has to know of the code in order to be bound by it, because and that "ignorance of the law isn't a valid [defense]." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 52 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 52 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

49. According to the 2004 edition of NFPA 96, cooking equipment shall not be operated while its fire extinguisher system or exhaust system is nonoperational or otherwise impaired.

50. Between the back of the hood and the back wall of the kitchen, there was a gap of approximately six inches in size, which was covered by a "sheet metal spacer . . . at the bottom," which "was riveted in place." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 54 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 54 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

51. After the fire, Mr. Valentine found no evidence that any of the sheet metal had been missing from the exhaust hood before the fire, because "we had the sheet metal," which was sufficient to cover the entire length of the hood.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 55 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 55 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

52. Moreover, no one else has testified that there were any gaps in the sheet metal spacer before the fire other than the hole where a gas pipe passed through the spacer; in fact, one of the cooks, Joseph Nadherny, testified that, before the fire, they could not clean the area between the back of the hood and the kitchen wall because "the wall went right up into the hood."  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 56 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 56 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

53. Based on the restaurants that Mr. Valentine sees, a reasonable standard or frequency for the cleaning of the back wall of a commercial kitchen cooking line was cleaning on a weekly basis.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 57 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 57 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

54. The hood covered all of the cooking appliances.

55. There was no fire-rated ceiling in the kitchen, nor was there a fire-rated stopping between the kitchen ceiling and the attic.

56. The kitchen had been inspected by the Town of Sennett Codes Enforcement Officer in 2005. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 63 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 63 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

57. There are no Codes Enforcement inspection reports of inspections at Highland Park where a non-compliance notice was issued with regard to the hood ventilation of the fire suppression system. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 64 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 64 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

58. The Town of Sennett Codes Enforcement Officer was the Authority Having Jurisdiction ("AHJ") for ongoing construction and–if inspected those systems–the ventilation system and the fire suppression system under the hood. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 65 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 65 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

59. A "total Ansul system" would include handheld fire extinguishers, the purpose of the handheld extinguishers being to extinguish fires burning outside the "protected area," including fires burning on the back wall of the cook line.

60. An Ansul kitchen fire suppression system "can't be expected to put out fires that are outside its area of protection." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 67 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 67 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

61. If kitchen staff are "not in the kitchen when a fire spreads outside the area protected by the Ansul system, that's going to limit your ability to put it out with a handheld fire extinguisher." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 68 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 68 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

62. A fire suppression system company would not have to dismantle the wall behind the kitchen hood to determine whether it was constructed of a limited combustible. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 69 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 69 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

63. Plaintiff's expert offers no opinion as to what the precise clearance should have been between the back wall of the kitchen and the hood (other than the 18-inch clearance from a single wall duck to combustibles, as required by the Code). (Dkt. No. 61, Attach. 12, at 51-52 [Valentine Dep., asserting fact]; Dk. No. 61, Attach. 7, at 56-60 [Valentine Dep., asserting fact].)

64. The word "enclosure," as it is referred to in the kitchen fire suppression business, refers to "encapsulating the hood and ventilation system from combustibles."

65. "Enclosures are not required where there's no fire rated ceiling." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 72 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 72 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

66. Plaintiff's kitchen fire suppression expert, Mr. Valentine, is not offering any opinions that Sanford & Burtis improperly recharged the system in June 2006.

67. Under the circumstances, the Ansul fire suppression system activated and extinguished the fire on the cooking surfaces and in the ventilation system. (*Compare* Dkt. No. 68, Attach. 2, at ¶¶ 58-60, 74 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶¶ 58-60, 74 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

68. An Ansul fire suppression system is not intended to extinguish a fire on the back wall of a kitchen cook line. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 75 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 75 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

69. There is nothing in the recharge and resetting procedures in the Ansul manual that requires a company that is recharging the system to inspect the duct work or the ventilation system. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 76 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 76 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

70. NFPA 17A is the standard for the installation and maintenance of wet chemical extinguishing systems such as the Ansul system at Highland Park.

71. The word "inspection" is defined as a "visual examination of a system or portions thereof to verify that it appears to be in operating condition and free of physical damage." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 78 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 78 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

72. The explanatory material in the Annex of NFPA 17A describes an inspection as follows: "Inspection. This is done by seeing that the system is in place, that it has not been activated or tampered with, and that there is no obvious physical damage or condition to prevent operation." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 79 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 79 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

73. When NFPA 17A says "prevent operation," it is referring to the operation of the Ansul wet chemical system. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 80 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 80 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

74. According to the 2002 edition of NFPA 17A, "[a]ll extinguishing systems shall be recharged after use or as indicated by an inspection or maintenance procedure."

75. NFPA 17A further states that "[s]ystems shall be recharged in accordance with the manufacturer's listed installation and maintenance manual."

76. These sections are "all that NFPA 17A says about recharging." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 83 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 83 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

77. The report of Plaintiff's expert Mr. Valentine states that Sanford & Burtis was negligent in that it failed to inspect the Ansul fire suppression system (in accordance with its

listing) by inspecting, servicing, and maintaining the suppression system for noncompliance in the ventilation system, including the "gap" and the "non-liquid tight weld at the duet collar." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 84 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 84 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citations].)

78.   As to the "non-liquid tight weld at the duct collar," Mr. Valentine agrees that the seam and flange welds themselves are located on the outside of the duct work.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 85 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 85 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

79.   Someone conducting an "inspection"' of the hood system in accordance with the NFPA would not be able to see the welds in question from the floor.  (Dkt. No. 61, Attach. 12, at 68-71 [Valentine Dep., asserting fact]; Dkt. No. 61, Attach. 7, at 101-02 [Valentine Dep., asserting fact].)

80.   The back wall of the cook line should have been cleaned on a weekly basis. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 88 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 88 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

81.   This was because any grease that built up on that portion of the wall would have been combustible.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 89 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 89 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

82. Because of the way that grease condenses out of grease-laden vapors and the way that warm grease-laden vapors rise, there would also be a build up of grease on the sheet metal that covered the gap between the hood and the wall.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 90 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 90 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

83. Photographs confirm that there was a build up of grease on the stainless steel that covered the gap between the hood and the back wall of the cook line.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 91 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 91 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

84. Before the fire, the stainless steel that covered the gap should have been cleaned.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 92 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 92 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

85. If one were to have cleaned the stainless steel that covered the gap, "[one] would [have] realize[d] there was a gap there."  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 93 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 93 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

86. The kitchen staff at Highland Park were supposed to clean the back wall of the kitchen on a weekly basis.  (*Compare* Dkt. No. 68, Attach. 2, at ¶ 94 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt.

No. 71, Attach. 2, at ¶ 94 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

87. Once a month, the Highland Park kitchen staff would pull the cooking appliances away from the wall and clean the back wall. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 95 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 95 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

88. The cleaning would extend right up into the joint between the hood and the wall. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 96 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 96 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

89. Nothing prevented the Highland Park staff from seeing the joint between the hood and the wall. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 97 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 97 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

90. The cooking appliances were 6 to 8 inches away from the wall, but those appliances were directly under the hood opening. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 98 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citations] *with* Dkt. No. 71, Attach. 2, at ¶ 98 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

91. The "hood system" included the "portion of sheet metal that was between the opening and the wall." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 100 [Def. Sanford & Burtis' Rule 7.1

Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 100 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

92. The Highland Park staff would clean that "portion of sheet metal." (*Compare* Dkt. No. 68, Attach. 2, at ¶ 101 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 101 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

93. To the extent that there was a pipe penetrating that portion of the sheet metal, the Highland Park staff would clean around the pipe opening and be aware that there was an opening in the sheet metal for the pipe to pass through. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 102 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 102 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

94. When the Highland Park staff cleaned the hood and back wall, they cleaned it down to bare metal; and any screws attaching the hood to the wall would be visible when they were done. (*Compare* Dkt. No. 68, Attach. 2, at ¶ 103 [Def. Sanford & Burtis' Rule 7.1 Statement, asserting fact and supporting fact with accurate record citation] *with* Dkt. No. 71, Attach. 2, at ¶ 103 [Plf.'s Rule 7.1 Response, not supporting denial with accurate or material record citation].)

## II.      RELEVANT LEGAL STANDARDS

### A.      Standard Governing Motion for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct

the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Standard Governing Unopposed Motions

In this District, where a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of the motion), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting . . . of the motion . . . , unless good cause be shown.").[2]

---

[2]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 WL 325378, at *8-9 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground); *Frink Am., Inc. v. Champion Road Mach., Ltd.*, 48 F. Supp. 2d 198, 209 (N.D.N.Y.1999) (McAvoy, C.J.) ("Plaintiff does not address these claims in his opposition papers, leading the Court to conclude that it has abandoned them.") (collecting cases); *Niles v. Nelson*, 72 F. Supp.2d 13, 22 (N.D.N.Y.1999) (McAvoy, C.J.) (holding that when a party does not respond to a portion of the opposing party's motion, they indicate that they consent to the granting of summary judgment with respect to that portion of the motion or have abandoned the claim); *cf. Di Giovanna v. Beth Isr. Med. Ctr.*, 08-CV-2750, 2009 WL 2870880, at *10 n.108 (S.D.N.Y. Sept. 8, 2009) (citing cases for proposition that plaintiff's failure to respond to argument made in summary judgment motion as to why certain claim should be dismissed constitutes abandonment of claim).

What this means is that, where a defendant has properly filed a memorandum of law (in support of a properly filed motion), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are facially meritorious.[3]  A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest."[4]

## C.    Standards Governing Claims for Negligence, Breach of Contract and Breach of Express or Implied Warranties

Because the parties have, in their memoranda of law, demonstrated an accurate understanding of the legal standards governing Plaintiff's claims of negligence, breach of contract, and breach of express or implied warranties, the Court will not recite those legal

---

[3]      *See Hernandez v. Nash*, 00-CV-1564, 2003 WL 22143709, at *2 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (stating that, before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is facially meritorious") [citations omitted], *adopted by* Decision and Order (N.D.N.Y. filed Sept. 30, 2003) (Scullin, C.J.); *accord, Topliff v. Wal-Mart Stores E. LP*, 04-CV-0297, 2007 WL 911891, at *7 & n.43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick*, 05-CV-0380, 2007 WL 894375, at *2 & n.2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 WL 951447, at *6 & n.40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey*, 03-CV-0170, 2006 WL 3940592, at *2 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 WL 189021 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

[4]      *See Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest"); *accord, Saunders v. Ricks*, 03-CV-0598, 2006 WL 3051792, at *9 & n.60 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *17 & n.109 (N.D.N.Y. Apr. 24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League*, 251 F. Supp. 2d 1106, 1109-10 (N.D.N.Y. 2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3]); *Wilmer v. Torian*, 96-CV-1269, 1997 WL 640982, at *1 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss and the reasons set forth in defendants' motion papers), *adopted by* 980 F. Supp. 106, 106 (N.D.N.Y.1997) (Pooler, J.); *accord, Carter v. Superintendent Montello*, 95-CV-0989, 1996 WL 589372, at *2 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 1996 WL 589372 (N.D.N.Y.1996) (Pooler, J.).

standards in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will discuss those legal standards only where necessary below in this Decision and Order.

## III.   ANALYSIS

### A.   Defendant D'Alberto's Motion for Summary Judgment

After carefully considering the matter, the Court dismisses Plaintiff's breach-of-warranty claim against Defendant D'Alberto with prejudice for the reasons stated by Defendant D'Alberto and conceded by Plaintiff. *See, supra,* Part I.B.1. of this Decision and Order. The arguments asserted by Defendant D'Alberto have facial merit. *Id.* In any event, those arguments would survive the more-rigorous scrutiny appropriate for a contested motion. *Id.*

With regard to Plaintiff's breach-of-contract claim against Defendant D'Alberto, the Court can find, for the reasons offered by Plaintiff, at least some admissible evidence in the record from which a rational fact-finder could conclude that Defendant D'Alberto (1) created an oral contract with Plaintiff to repair the southern kitchen exhaust fan in a safe and expeditious manner in September 2007, and (2) breached that oral contract when it (a) advised Plaintiff it could continue to cook lightly with only one fan in operation that day, and (b) then removed, and took back to his shop for repair, the fan assembly and blower without leaving a replacement fan or other alternative venting/exhaust mechanism in place that day. *See, supra,* Parts I.B.1. and I.C.1. of this Decision and Order. *See also Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc.*, 511 F.2d 1252, 1259 (2d Cir. 1975). (*See, e.g.,* Dkt. No. 65, Attach. 1, at ¶ 4-5 [D'Alberto Affid.]; Dkt. No. 59, Attach. 14, at 29-30 [Janowski Dep.].)

Moreover, with regard to Plaintiff's negligence claim against Defendant D'Alberto, the Court can find, for the reasons offered by Plaintiff, at least some admissible evidence in the

record from which a rational fact-finder could conclude that Defendant D'Alberto breached its duty of care to Plaintiff when it (1) advised Plaintiff it could continue to cook lightly with only one fan in operation that day, and (2) then removed, and took back to his shop for repair, the fan assembly and blower without leaving a replacement fan or other alternative venting/exhaust mechanism in place that day. *See, supra,* Parts I.B.1. and I.C.1. of this Decision and Order.

The Court notes that it has trouble concluding that Paragraph 4.1.5. of NFPA 96 relieves Defendant D'Alberto of any possible responsibility for the consequences of its actions under the circumstances for three reasons: (1) it is not clear that Plaintiff is seeking to hold D'Alberto responsible for the "maintenance*"* of the ventilation control and fire protection of the commercial cooking operation at Highland Park under Paragraph 4.1.5. of NFPA 96; (2) in the alternative, it does not appear that Paragraph 4.1.5. of NFPA 96 was incorporated within the Fire Code of New York State at the time of the fire (*see* Dkt. No. 87, at 1-2 [Plf.'s Sur-Reply]); (3) in any event, NFPA 96 sometimes sets forth the *minimum* fire-safety standards related to cooking operations in the industry (permitting a breach by a third party even where NFPA 96 has been complied with by a property owner).[5]

### B.      Defendant Jerome's Motion for Summary Judgment

After carefully considering the matter, the Court dismisses Plaintiff's breach-of-warranty claim against Defendant Jerome with prejudice for the reasons stated by Defendant Jerome and conceded by Plaintiff. *See, supra,* Part I.B.2. of this Decision and Order. The arguments asserted by Defendant Jerome have facial merit. *Id.* In any event, those arguments would survive the more-rigorous scrutiny appropriate for a contested motion. *Id.*

---

[5]          *See, infra,* notes 6 and 7 of this Decision and Order.

With regard to Plaintiff's breach-of-contract claim against Defendant Jerome, the Court can find, for the reasons offered by Plaintiff, at least some admissible evidence in the record from which a rational fact-finder could conclude that (1) Plaintiff was the intended third-party beneficiary of the contract between Defendant Jerome and Defendant ABJ Fire with regard to the semi-annual inspections of the Ansul system at Highland Park "per NFPA guidelines and specifications" between approximately June 2005 and August 2006 (the last of which occurred on August 15, 2006), and (2) Defendant Jerome breached that contract by failing to detect and warn Plaintiff of the hazards resulting from (a) the gap that existed between the hood and the back wall of the kitchen, and/or (b) the non-liquid tight welds at the duct collar in the hood. *See, supra,* Parts I.B.2. and I.C.2. of this Decision and Order. *See also State of Cal. Pub. Emp. Ret. Sys. v. Shearman & Sterling*, 718 N.Y.S.2d 256, 259 (N.Y. 2000). (*See, e.g.,* Dkt. No. 58, Attach. 2, at 2 [Ltr. of June 24, 2005]; Dkt. No. 59, Attach. 3 [Jerome Price Quote dated July 21, 2005]; Dkt. No. 59, Attach. 2 [Invoice dated July 28, 2005]; Dkt. No. 59, Attach. 7 [Invoice dated Feb. 20, 2006]; Dkt. No. 58, Attach. 1 [Ltr. of Aug. 7, 2006]; Dkt. No. 58, Attach. 37 [Invoice dated Aug. 15, 2006]; Dkt. No. 59, Attach. 4 [Invoice dated Aug. 15, 2006].)

Finally, with regard to Plaintiff's negligence claim against Defendant Jerome, the Court can find, for the reasons offered by Plaintiff, at least some admissible evidence in the record from which a rational fact-finder could conclude that Defendant Jerome breached its duty of care to Plaintiff when it failed to detect and warn Plaintiff of the hazards resulting from (1) the gap that existed between the hood and the back wall of the kitchen, and/or (2) the non-liquid tight welds at the duct collar in the hood. *See, supra,* Parts I.B.2. and I.C.2. of this Decision and Order.

To this finding the Court adds only one point. As explained above, it appears that the contractual duty between the relevant parties was limited to the duty to perform a semi-annual inspection of the Ansul system at Highland Park "*per NFPA guidelines and specifications.*" However, it appears that the common-law duty to inspect (imposed by the law of negligence) was not so limited. This fact is significant. While breaching the NFPA may certainly give rise to a negligence claim, complying with the NFPA may not serve as an absolute defense to such a claim.[6] This is because NFPA guidelines and specifications are often minimums.[7]

### C. Defendant ABJ Fire's Motion for Summary Judgment

After carefully considering the matter, the Court dismisses Plaintiff's breach-of-warranty claim against Defendant ABJ Fire with prejudice for the reasons stated by Defendant ABJ Fire and conceded by Plaintiff. *See, supra,* Part I.B.3. of this Decision and Order. The arguments asserted by Defendant ABJ Fire have facial merit. *Id.* In any event, those arguments would survive the more-rigorous scrutiny appropriate for a contested motion. *Id.*

---

[6] *See, e.g., Deleon v. Northrup Grumman Sys. Corp.*, 02-CV-1379, 2004 WL 3186504, at *3 (D. N.M. June 15, 2004) ("[R]egardless of compliance with NFPA, there remains a genuine dispute regarding whether Waterous breached a duty owed to Plaintiff and in so doing acted with sufficient mental culpability to give rise to liability for punitive damages."); *Davis v. Brickman Landscaping, Ltd.*, No. L-0026-07, 2012 WL 2579502, at *4 (N.J. Super. Ct. App. Div. 2012) ("We conclude that defendants' compliance with NFPA 25 is not dispositive on the issue of negligence; rather, a reasonable care standard applies.").

[7] (*See* Dkt. No. 61, Attach. 9, at 9 [Paragraph 1.1.1. of NFPA 96, stating, "This standard shall provide the minimum fire safety requirements (preventative and operative) related to the design, installation, operation, inspection, and maintenance of all public and private cooking operations."].) *See, e.g., Deleon*, 2004 WL 3186504, at *3 (D. N.M. June 15, 2004) ("[I]t is well-settled that industry standards are often minimums, as NFPA standards are, and evidence of compliance is, therefore, admissible and instructive but not dispositive on legal duties or standards of care."); *cf. Commerce and Indus. Ins. Co. v. Grinnell Corp.*, 97-CV-0803, 1999 WL 508357, at *4 (E.D. La. July 15, 1999) ("[T]he NFPA does not list, inspect, certify or approve any products or materials for compliance with its standards. It merely sets forth safety standards to be used as minimum guidelines that third parties may or may not choose to adopt, modify or reject.").

With regard to Plaintiff's breach-of-contract claim against Defendant ABJ Fire, the Court can find, for the reasons offered by Plaintiff, at least some admissible evidence in the record from which a rational fact-finder could conclude that (1) Defendant ABJ Fire entered a contract with Plaintiff to perform semi-annual inspections of the Ansul system at Highland Park "per NFPA guidelines and specifications" between approximately June 2005 and August 2006 (three of which were performed on or about July 27, 2005, February 20, 2006, and August 15, 2006, and the fourth of which was never subsequently performed), and (2) Defendant ABJ Fire breached that contract by failing to detect and warn of the hazards resulting from (a) the gap that existed between the hood and the back wall of the kitchen, and/or (b) the non-liquid tight welds at the duct collar in the hood (as evident from the fact that the inspection reports incorrectly stated that the "[h]ood/duct penetrations [were] sealed w/ weld or UL devices"). *See, supra,* Parts I.B.3. and I.C.3. of this Decision and Order. (*See, e.g.,* Dkt. No. 59, Attach. 17 [Ltr. dated June 24, 2005]; Dkt. No. 59, Attach. 5 [Inspection Report dated July 27, 2005]; Dkt. No. 58, Attach. 15 [Inspection Report dated Aug. 15, 2006].)

Finally, with regard to Plaintiff's negligence claim against Defendant ABJ Fire, the Court can find, for the reasons offered by Plaintiff, at least some admissible evidence in the record from which a rational fact-finder could conclude that Defendant ABJ Fire breached its duty of care to Plaintiff when it failed to detect and warn Plaintiff of the hazards resulting from (1) the gap that existed between the hood and the back wall of the kitchen, and/or (2) the non-liquid tight welds at the duct collar in the hood. *See, supra,* Parts I.B.3. and I.C.3. of this Decision and Order. To this finding the Court adds only the point it made above in Part III.B. of this Decision and Order: the fact that Defendant ABJ Fire may have complied with the NFPA may not serve as an absolute defense to Plaintiff's negligence claim. *See, supra,* notes 6 and 7 of this Decision and Order.

**D.** **Defendant Sanford & Burtis' Motion for Summary Judgment**

After carefully considering the matter, the Court dismisses Plaintiff's breach-of-warranty claim against Defendant Sanford & Burtis with prejudice for the reasons stated by Defendant Sanford & Burtis and conceded by Plaintiff. *See, supra,* Part I.B.4. of this Decision and Order. The arguments asserted by Defendant Sanford & Burtis have facial merit. *Id.* In any event, those arguments would survive the more-rigorous scrutiny appropriate for a contested motion. *Id.*

With regard to Plaintiff's breach-of-contract claim against Defendant Sanford & Burtis, the Court finds, for the reasons offered by Defendant Sanford & Burtis, no admissible evidence in the record from which a rational fact-finder could conclude that Defendant Sanford & Burtis incurred any contractual obligation to inspect the Ansul fire suppression system in question after February of 2001, including during the limited "recharge" of the system orally requested of Defendant Sanford & Burtis by Defendant Jerome on or about June 28, 2006 (thus rendering that breach-of-contract claim barred by the governing six-year statute of limitations, as a matter of law). *See, supra,* Parts I.B.4. and I.C.4. of this Decision and Order. (*See, e.g.,* Dkt. No. 58, Attach. 30 [handwritten notes of telephone call]; Dkt. No. 58, Attach. 27, at 189, 193-96 [Burtis Dep.].)

Finally, with regard to Plaintiff's negligence claim against Defendant Sanford & Burtis, the Court finds, for the reasons offered by Defendant Sanford & Burtis, no admissible evidence in the record from which a rational fact-finder could conclude that Defendant Sanford & Burtis breached any duty of care to Plaintiff when, during its "recharge" on or about June 28, 2006, it allegedly "failed" to detect and warn Plaintiff of the hazards resulting from (1) the gap that existed between the hood and the back wall of the kitchen, and/or (2) the non-liquid tight welds

at the duct collar in the hood (which dangers manifested themselves at the fire in this action on September 4, 2007). *See, supra,* Parts I.B.4. and I.C.4. of this Decision and Order. (*See also* Dkt. No. 61, Attach. 13 [NFPA 17A].)

The Court notes that the recharge in question was necessitated not by a semi-annual inspection but by a fire that occurred at Highland Park when butter boiled over the side of a pan and caught fire. (Dkt. No. 58, Attach. 27, at 189, 193-96 [Burtis Dep.].) The Court notes also that the only reason that the pull station was recorded as being "blocked," following the recharge, was that the serviceman employed by Sanford & Burtis "noticed something very obvious" during the recharge. (Dkt. No. 58, Attach. 27, at 195-96 [Burtis Dep.]; Dkt. No. 58, Attach. 13 [Ltr. dated July 10, 2006]; Dkt. No. 58, Attach. 14 [Sanford & Burtis Service Call Document dated June 28, 2006].) Under the circumstances, it would be unreasonable to impose on Defendant Sanford & Burtis a duty to discover and report one or more unrelated conditions. *See, e.g., Oquendo v. Cincinnati Inc.*, 05-CV-9398, 2007 WL 1988154, at *4 (S.D.N.Y. July 9, 2007) ("Cincinnati had no duty to inspect the machinery for defects unrelated to problems it was summoned to correct, or to warn the Plaintiff's employer of any such defects.").

**ACCORDINGLY**, it is

**ORDERED** that Defendant D'Alberto's motion for summary judgment (Dkt. No. 65) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part**, such that Plaintiff's breach-of-warranty claim against Defendant D'Alberto is **<u>DISMISSED</u>**, but Plaintiff's breach-of-contract claim and negligence claim against Defendant D'Alberto **<u>SURVIVE</u>** Defendant D'Alberto's motion; and it is further

**ORDERED** that Defendant Jerome's motion for summary judgment (Dkt. No. 66) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part**, such that Plaintiff's breach-of-warranty claim against Defendant Jerome is **<u>DISMISSED</u>**, but Plaintiff's breach-of-contract claim and negligence claim against Defendant Jerome **<u>SURVIVE</u>** Defendant Jerome's motion; and it is further

**ORDERED** that Defendant ABJ Fire's motion for summary judgment (Dkt. No. 67) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part**, such that Plaintiff's breach-of-warranty claim against Defendant ABJ Fire is **<u>DISMISSED</u>**, but Plaintiff's breach-of-contract claim and negligence claim against Defendant ABJ Fire **<u>SURVIVE</u>** Defendant ABJ Fire's motion; and it is further

**ORDERED** that Defendant Sanford & Burtis' motion for summary judgment (Dkt. No. 68) is **<u>GRANTED</u>** such that all of Plaintiff's claims Defendant Sanford & Burtis are **<u>DISMISSED</u>**; and it is further

**ORDERED** that, because Defendant Sanford & Burtis' cross-claims against its co-Defendants seek contribution and indemnification for its own liability to Plaintiff (which liability has been found not to exist, as a matter of law), those cross-claims (Dkt. No. 18, at ¶¶ 123-135) are also **<u>DISMISSED</u>**; and it is further

**ORDERED** that counsel are directed to appear on **SEPTEMBER 24, 2013** at 1:30 pm in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **AUGUST 30, 2013**, and the parties are directed to engage in meaningful settlement negotiations prior to the 9/24/13 conference. In the event that counsel feel settlement is unlikely, counsel

may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: August 12, 2013
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge